Eugene L. CURTIS and Eileen Curtis,
Plaintiffs-Appellees.

v.

GENERAL MOTORS CORPORATION, a
Delaware Corporation,
Defendant-Appellant.

No. 79–1679.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 8, 1980.

Decided May 26, 1981.

Rehearing Denied June 25, 1981.

Gerald P. McDermott of Hoffman & McDermott, Denver, Colo. (William J. Hansen of Hoffman & McDermott and Alan V. Wallach, Denver, Colo., with him on the brief), for plaintiffs-appellees.

Thomas S. Nichols of Davis, Graham & Stubbs, Denver, Colo. (Robert H. Harry of Davis, Graham & Stubbs, Denver, Colo., with him on the brief, Otis M. Smith, Douglas E. Brown, John P. Raleigh and Keith Landenberger, Detroit, Mich., of counsel), for defendant-appellant.

Before SETH, Chief Judge, and McKAY and SEYMOUR, Circuit Judges.

SETH, Chief Judge.

This action was commenced in the United States District Court for the District of Colorado based on diversity jurisdiction. It is a strict liability claim arising from a one-car accident in which plaintiff Eugene Curtis sustained several serious injuries. Defendant's motion for a directed verdict was denied and the case was submitted to a jury which found for the plaintiffs. General Motors' motions for judgment n. o. v., or in the alternative, for a new trial were denied and this appeal followed.

Plaintiffs' theory of the case was that the automobile, a 1973 Chevrolet Blazer which Mr. Curtis was driving at the time of the accident, was improperly designed. Plaintiffs contended that the vehicle was defective and unreasonably dangerous because it failed to provide adequate roll-over protection.

The accident occurred on an icy country road in Grand County, Colorado. Mr. Curtis lost control of the car due to the condition of the road and the speed he was driving. The car skidded and slid laterally off the road down a barrow pit and while still going sideways tripped on a driveway. The speed of this slide and the violent contact with the driveway caused the vehicle to then roll over and continue about fifty feet farther rolling or skidding on its top. The Blazer was equipped with a removable fiberglass top which cracked and separated from the body of the car during the roll-over. The occupants, who were not wearing seatbelts, were tossed around during the car's violent movements. Mr. Curtis was partially ejected under the car and was partly outside when the car came to rest in an upside down position.

Plaintiff alleged that General Motors was strictly liable for the ruptured disc and nerve damage to plaintiff's back as they were proximately caused by the Blazer's inadequate roof. He also asserts this could have been avoided by the installation of a roll bar or other supports in the roof. He thus invokes the doctrine variously called the "second collision," "crashworthiness," or "enhancement," seeking to impose liability on a manufacturer for design defects which contribute to injuries sustained in an accident not originally caused by the defect. *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir.). Thus he asserts under this doctrine that defendant does have a duty to use reasonable care in the design and manufacture of its product so as " 'to eliminate any unreasonable risk of foreseeable injury' as a result of a collision." *Dreisonstok v. Volkswagenwerk, A. G.*, 489 F.2d 1066, 1069 (4th Cir.), quoting *Larsen v. General Motors Corp.*, 391 F.2d 495, 503 (8th Cir.) (wherein the doctrine is clearly stated). *See also Huff v. White Motor Corp.*, 565 F.2d 104 (7th Cir.), and cases cited therein.

Colorado adheres to the "crashworthiness" doctrine. In *Roberts v. May*, 41 Colo.App. 82, 583 P.2d 305, the court expressly adopted this position "based on the pragmatic observation that collisions and accidents are natural, foreseeable consequences of automobile use." 583 P.2d at 307. The court remarked that:

> "The second collision doctrine, however, does not end the inquiry.... The critical question is whether, under all of the surrounding circumstances, a manufacturer has created an unreasonable risk of increasing the harm in the event of the statistically inevitable collision."

Colorado has also consistently followed the Restatement (Second) of Torts § 402A in formulating its products liability law. Thus, a product must be defective and unreasonably dangerous. *Potthoff v. Alms*, 41 Colo.App. 51, 583 P.2d 309. To be unreasonably dangerous, it must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer or user. Restatement (Second) of Torts § 402A, Comment i; *Bradford v. Bendix-Westinghouse Automatic Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406. On appeal appellant argues that under Colorado law the Blazer was not defective as a matter of law, and that it is entitled to a new trial.

General Motors introduced the Chevrolet Blazer in its spring 1969 line of models. The original vehicle was marketed as a four-wheel drive vehicle with no top at all for use both on and off the highway. General Motors expected to capture part of the market already dominated by such manufacturers as American Motors (Jeep), International Harvester (Scout), and Ford (Bronco).

Mr. Curtis purchased his Blazer in 1975 from a previous owner. The vehicle was a 1973 model equipped with a removable fiberglass top. This top, which weighed about 240 pounds, was connected to the frame by bolts which could be loosened with a wrench. Detailed instructions for removal of the top were contained in the owner's manual, and a caution label listing basic instructions was displayed in the vehicle. The top was thus relatively easy to remove to facilitate the open air style should it be desired. At the time Mr. Curtis purchased his Blazer General Motors was offering it in four body styles. They were the original roofless style, one with a factory installed canvas top over steel framing, the Suburban which was essentially a Blazer with a steel top, and the model with a removable fiberglass top.

The fiberglass top was designed to protect the occupants from the elements, and was expected to afford more protection against wind and rain than a typical canvas convertible top. But General Motors concededly did not design the fiberglass roof with any expectation that it could withstand the severe impact involved in a rollover accident at even moderate speed. The Blazer here concerned did not have a roll bar. Such devices were offered in the after-market. General Motors admitted that a factory installed roll bar would have been a feasible alternative or accessory.

Where, as here, a strict liability claim is predicated on a manufacturer's failure to install an added safety device, liability will not attach merely because a feasible alternative would have rendered the product safer. *Weakley v. Fischbach & Moore, Inc.*, 515 F.2d 1260, 1267 (5th Cir.). The focus instead is on the present design of the product. As mentioned, several other models were offered by Chevrolet which would have better afforded protection that was unfortunately required here. Plaintiff Curtis made a deliberate choice to purchase a vehicle which, as a reasonable consumer, he should have expected was not as safe as others on the market. In essence the Blazer he purchased was a convertible. A "convertible," according to Webster's Third New International Dictionary, is an automobile "having a top that may be folded back, lowered, or removed." In *Dreisonstok*, the court remarked in dictum:

> "If a person purchases a convertible, as *Dyson* [*v. General Motors Corp.*, 298 F.Supp. 1064, 1073 (E.D.Pa.),] makes clear, he cannot expect—and the Court may not impose on the manufacturer the duty to provide him with—the exact kind of protection in a rollover accident as in the 'standard American passenger car'."

489 F.2d at 1075. *See also Chrysler Corporation v. Department of Transportation*, 472 F.2d 659, 679 (6th Cir.).

The Blazer was traveling on an ordinary country road. It was snowpacked and had rough spots. There were several estimates as to the speed of the car, but it obviously was too great for the conditions. Plaintiff lost control. The car slid off the road down and across a barrow pit and was traveling sideways at least twenty miles per hour when the wheels struck the elevated driveway. This overturned the Blazer, and it may have overturned again, but in any event slid on its top and stopped upside down about fifty feet from the driveway. The testimony of plaintiffs' witness was that any passenger car would have overturned under these circumstances. The roll-over was thus not by reason of the nature of the vehicle.

The Blazer was a special purpose vehicle with off-road capability, four-wheel drive, and open air-no top option. At the time of the accident it was utilizing none of its special purpose capability, but was being used as an ordinary passenger car with a convertible top.

The top options have been described and plaintiff made his choice. He was at least an ordinary consumer. He had experience with cars. There was no lack of warning issue in the case. The testimony of plaintiffs' expert was that a steel top is safer than the fiberglass top. It is obvious that some tops are safer than others. The expert also testified that an off-road vehicle with a high center of gravity and used in off-road situations would be safer with a steel top or a roll bar, but we are concerned with the use of the Blazer on an ordinary road as an ordinary passenger car.

With this special purpose vehicle with special features it was necessary to compromise on steel top safety if the buyers were to be given the choices. And, in fact, if the vehicle was to be marketed at all with no top, canvas top, or fiberglass top, a compromise was necessary. If there be no compromise and only the very safest can be marketed, there obviously would be no choice for the buyer as the less safe options would be eliminated. This exclusion should not be the result as demonstrated in *Dreisonstok v. Volkswagenwerk, A. G.*, 489 F.2d 1066 (4th Cir.):

> "The likelihood of harm is tied in with the obviousness of the danger, whether latent or patent, since it is frequently stated 'that a design is not unreasonably dangerous because the risk is one which anyone immediately would recognize and avoid.' The purposes and intended use of the article is an even more important factor to be considered. After all, it is a commonplace that utility of design and attractiveness of the style of the car are elements which car manufacturers seek after and by which buyers are influenced in their selections. In every case, the utility and purpose of the particular type of vehicle will govern in varying degree

the standards of safety to be observed in its design. This was recognized in the Traffic and Motor Vehicle Safety Act...."

See also Chrysler Corporation v. Department of Transportation, 472 F.2d 659 (6th Cir.), and the convertible references in Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.). The Colorado Court of Appeals in Roberts v. May, 41 Colo.App. 82, 583 P.2d 305, 308, stated:

"Manufacturers are not required to produce automobiles with the 'strength and crash-damage resistance features of an M–2 Army tank.' Melia v. Ford Motor Co., 534 F.2d 795 (8th Cir. 1976) (Bright, J., dissenting). The critical question is whether, under all of the surrounding circumstances, a manufacturer has created an unreasonable risk of increasing the harm in the event of the statistically inevitable collision."

The compromise referred to above was obvious to an average buyer—soft tops and no tops on cars are common as the evidence indicated. This is really what "reasonable" is all about—"reasonably dangerous," "unreasonably dangerous," "unreasonable risk of injury in the event of a collision."

■ In referring to the "unreasonably dangerous" portion of section 402A of the Restatement (Second) the Colorado Supreme Court in Union Supply Co. v. Pust, 196 Colo. 162, 583 P.2d 276, 282, n. 5, said: "We find that the 'unreasonably dangerous' portion of the definition serves the useful function of placing some limits on the liability of a manufacturer or seller." To apply the "unreasonably dangerous" standard in Colorado the jury has to consider the vehicle in such context with the relative degrees of danger in the choices since all cannot provide the same degree of safety. This is the application of the reasonableness element in ALI section 402A to the special purpose capabilities—the nature of the vehicle.

■ The jury was not permitted to consider this aspect of the reasonable standard because instructions were not given on the point although requested. Reasonableness as to this trade-off on the very safest was thus not considered. This omitted an essential element of the Colorado-ALI doctrine as it pertains to the Blazer, to convertibles, or any special purpose vehicle.

It is apparent that plaintiff made a choice when he bought the Blazer, a choice as to the top. If any convertible would have overturned in this accident, as the testimony indicated it would, then the roll bar as a factory installation or option is not significant.

The cause of plaintiff's back injury was not shown. As mentioned above, he was partly under and partly out of the overturned Blazer and lying on the ground. He was removed from this position with some difficulty. This is all that the witnesses testified as there was no testimony that the Blazer was actually resting on plaintiff, but he certainly was partly under it. The testimony and medical information introduced indicated no broken vertebrae and no bruises on plaintiff's back. It is obvious from the record that he was shaken around in the car by the violence of the accident. He received other injuries not here sued upon. These consisted of a fractured skull, broken leg, and a shoulder injury. A passenger was killed.

The medical witness of plaintiffs testified that he could not ascertain the cause of the disc injury with any degree of medical certainty. It was not an absence of medical testimony but a statement that he could not ascribe a cause. He in part said of this:

"Q (By Mr. McDermott) Well, is it your opinion then, Doctor, that based upon a reasonable degree of medical probability, that the separation, the failure and separation of the roof from the Blazar aggravated or enhanced any injuries that Mr. Curtis might have otherwise sustained in rolling over?

"A I think I answered earlier that I don't think you could make that specific statement, because as we noted earlier you could be killed, you know, turning a car over with a good roll bar."

As to this basic question of causation the trial judge during the post trial hearings stated in part: "Nobody knows from this record, from any expert as to what caused which injury."

As to the cause of plaintiff's disc injury the case was submitted only on the doctor's testimony that he could not tell with any degree of medical certainty the cause of the problem. As an essential part of the plaintiffs' cause of action based on the crashworthiness doctrine it was necessary for them to show an enhancement of injury. *Union Supply Co. v. Pust*, 583 P.2d 276 (Colo.). This was required and it was not done. The jury was thus left to decide a question which the expert said he could not answer. *See* again *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir.), and *Roberts v. May*, 41 Colo.App. 82, 583 P.2d 305. The Second Circuit in *Caiazzo v. Volkswagenwerk, A.G.*, 647 F.2d 241, No. 79–7419, held that a plaintiff is required to establish the extent of enhanced injuries attributable to the defective design.

The plaintiff argues as to enhancement that he was there on the ground partly under and partly outside of the overturned Blazer and this is enough to show the cause of the back injury. But again there were no bruises shown and no one testified that the car was resting on his back. The trial judge's statement as to cause must be given great weight and in itself demonstrates an error in the application of the crashworthiness doctrine. The jury could not express a lay opinion as to the cause of the injury when the medical witness was unable to express an expert opinion. It is apparent that the nature of the injury here sued upon creates unusual problems of proof at best. Expert testimony is required in order for the jury to avoid pure speculation, or a conclusion arising from plaintiff's position after the accident but with no causal connection to the injury established by anyone's testimony.

The Colorado courts have indicated that in comparable situations the jury must be provided some expert opinion upon which to base its determination. In *Barter Machin-*ery and Supply Co. v. Muchow*, 169 Colo. 100, 453 P.2d 804, the Colorado Supreme Court said:

"Plaintiff persuaded the trial judge to instruct the jury on permanent injury and future pain even though such evidence came only from the plaintiff himself. Evidence such as given by plaintiff in this case will not support the giving of instruction on permanent injuries."

We also said in *Bearman v. Prudential Ins. Co. of America*, 186 F.2d 662 (10th Cir.) (in a case arising in Kansas), that the cause of death—the causal connection between the accident and the resulting injury—presented questions "not within the competency of laymen" and the testimony of an expert was required. We also there said:

"The great weight of authority supports the rule that medical expert testimony to be sufficient to take the case to the jury must be to the effect that the accident or injury probably caused the Insured's death; and that testimony to the effect that a causal connection between the accident or injury and Insured's ensuing death was possible, such as testimony that the accident or injury 'might have,' or 'may have,' or 'could have' caused the death of Insured, is insufficient to take the case to the jury, because such testimony leaves the issue in the field of conjecture and permits the jury to speculate or guess as to the cause of death."

For the above reasons the judgment of the trial court is set aside and the case is remanded for a new trial.