Jeff McHARGUE and Julia McHargue, Plaintiffs,

and

Continental Insurance Company, Cross–Claimant,

v.

STOKES DIVISION OF PENNWALT, Defendant.

Civ. A. No. 86–A–1301.

United States District Court, D. Colorado.

May 24, 1988.

Blaine A. Rutenbeck, Denver, Colo., J. Conard Metcalf, Williams, Trine, Greenstein & Griffith, P.C., Boulder, Colo., for plaintiffs.

James A. Clark, Bruce D. Pringle, D.J. Poyfair, Baker & Hostetler, Denver, Colo., for defendant.

Wendelyn K. Walberg, Kurt E. Walberg, Denver, Colo., for cross-claimant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This case involves a work-related inquiry sustained by plaintiff Jeff McHargue ("McHargue"), an employee of Denver Plastics, Inc. ("Denver Plastics"), when his hand was caught and crushed between the platens of a plastic injection molding machine manufactured by defendant Stokes Division of Pennwalt ("Stokes"). At the present time, Stokes is the sole defendant.[1] In their complaint, plaintiffs Jeff and Julia McHargue seek damages against Stokes under theories of negligence, warranty, and strict liability.

This matter is now before the court on defendant Stokes' motion for summary judgment. The parties have submitted briefs, affidavits, and other documentation in support of their respective positions, and oral argument was heard on May 13, 1988.

## BACKGROUND

Plaintiff Jeff McHargue began working for Denver Plastics as an operator in 1981, and was promoted to "first shift supervisor" approximately 18 months later. As first shift supervisor, McHargue was responsible for instructing new operators on the use of the plastic injection molding machines at Denver Plastics and for assigning operators to work the various machines. Additionally, upon arriving at the plant on Monday mornings, McHargue would turn on the machines that were going to be used and make whatever adjustments were necessary for the machines to function properly.

On the Monday morning of February 13, 1984, McHargue was working on a 300 ton plastic injection molding machine (known to employees as the "Blue 300") when the machine unexpectedly closed on his hand. The Blue 300 was manufactured by defendant Stokes and sold to Denver Plastics in 1977. Plaintiffs' claims are grounded upon their contention that the design of the Blue 300 is defective, rendering the product unreasonably dangerous.[2] Accordingly, in or-

---

1. The complaint originally asserted claims against Continental Insurance Company ("Continental"), the entity responsible for periodically inspecting the plastic injection molding machine which caused the injury. These claims, however, were dismissed from the action with prejudice pursuant to the Memorandum Opinion and Order of this court issued on December 18, 1986. Continental remains a party to the action, but only as a cross-claimant. Plaintiff's employer, Denver Plastics, is, of course, immune from liability pursuant to the provisions of the Workers Compensation law.

2. In addition to their strict liability claim, plaintiffs have also asserted claims sounding in negligence and warranty. Surprisingly, defendant's motion (which purports to be a motion for total, rather than partial, summary judgment) does not address the negligence and warranty claims.

der to fully appreciate the issues before the court on this motion, it is necessary to have some familiarity with the design of the injection molding machine in question.

Plastic injection molding, in general, is a method by which granular plastic material is softened in an electrically heated cylinder and forced by a plunger under high pressure through a nozzle into a relatively cool mold. The two halves of the mold are held together hydraulically under many tons of force to prevent leakage of the material during the high pressure injection cycle. The mold itself is kept relatively cool in order to harden the plastic just as soon as it fills the cavity.

The plastic injection molding machine in question consists in large part of two platens, upon which may be fastened the two halves of a mold. One platen moves horizontally to open and close the mold; the other remains stationary. When the two halves of the mold are brought together, heated plastic under high pressure is forced into the cavity created by the mold. After the plastic has cured, the movable platen returns to its original position, and the plastic product is either ejected automatically from the mold or removed manually.

The Blue 300 may be operated in either an automatic, semi-automatic, or manual mode. In all three modes, the operator's position is at the front of the machine. The operator is kept clear of the mold area by means of safety gates located at the front and rear of the machine. However, the operator can gain access to the mold area by raising either the front or rear safety gate. When either safety gate is opened, the machine should stop cycling to prevent injury to the operator.

In the automatic mode, the opening and closing of the mold is controlled by an automatic timing device. The platens open and close automatically, and the plastic product is automatically ejected from the mold. In the semi-automatic mode, the cycling of the machine is still controlled by a timer, but the operator also controls the machine by means of the sliding gate located at the front of the machine. The operator opens this gate at the end of the cycle

and manually removes the plastic product. He or she then closes the front gate, allowing a new cycle to begin. In the manual mode, the operation of the platens is accomplished by the operator, who presses control buttons to open and close the mold.

The machine in question is equipped with a number of safety devices designed to protect operators and other persons who might come near or come in contact with the mold area. When the front safety gate is opened, three such safety devices are triggered which should prevent the platens from closing. First, there is an electronic interlock which breaks the electric circuit that would otherwise operate to close the platens. Second, there is a hydraulic interlock which prevents the hydraulic components from operating. Third, there is a mechanical safety device that drops into place when the front gate is opened. This device consists of a metal bar that is threaded into the movable platen and which must pass through a hole in order for the platen to close. When the front gate is opened, a pawl drops down and blocks the hole so that the steel bar cannot pass through. It may be important to note that in order for the mechanical safety device to function, it must be manually adjusted each time the mold is changed.

In contrast, there was only one safety device associated with the rear safety gate on the date of the accident. This device is an electrical interlock, similar to the one associated with the front gate, which operates to break the electric circuit that would otherwise close the platens. Additionally, there is evidence that the rear safety guard originally had a lock which precluded access to the mold area from the rear unless the lock was opened with a special key. However, at some point this lock was modified so that a key was no longer required. No evidence was submitted as to who modified the lock or when the modification may have been made.

A number of warnings signs are also affixed to the Blue 300. These were placed on the machine at the time of its manufacture and were on the machine on the date

of the accident. Of particular importance are the following:

1. A yellow and black sign on the front safety gate which identifies when the safety devices for the front and rear gate should be checked and the procedure to be used in performing such tests.

2. Signs affixed to both the front and rear of the machine which state: "DANGER. Never place hands or any part of the body inside the die area without first shutting off the motor and locking out the disconnects except when removing molded parts thru the front safety gate."

The Blue 300 makes use of several timers which control the timing of various machine functions, including closure of the platens. The timers are not manufactured by Stokes, but rather by a third-party, Eagle Signal Company. These timers are a "plug-in" component of the machine, and are therefore easily inserted and removed. At the time of its sale, the machine in question had a set of Eagle timers in place. However, Eagle timers can be purchased through local suppliers, and the timers on the Blue 300 are interchangeable with timers on other Stokes machines at Denver Plastics.

Subsequent to the accident, inspection of the Blue 300 revealed that an Eagle cycle delay timer, which had been in the subject machine at the time of the accident, had been miswired. In simple terms, this miswiring resulted in the electrical interlock associated with the rear safety gate being by-passed. There is no evidence as to whether the timer was miswired when it was manufactured or at a later point in time. However, the timer may have been repaired by a company known as TESSCO, an authorized service representative for Eagle Signal Co., in May of 1983.

The accident at the center of this controversy occurred on a Monday morning, February 13, 1984. When he arrived that morning, McHargue began the process of determining which machines would need to be utilized for the day's production, and decided that the Blue 300 would be used. Since it was a Monday, he had to go through the process of turning on the machines that were to be used and adjusting the temperature. He then went to each machine and started the cycling motion to be sure each machine was functioning properly. He had two or three of the other machines cycling before he started the same process on the Blue 300.

When he came to the Blue 300, McHargue observed that the mold he needed was already in the machine. Accordingly, he did not check to see if the mechanical bar and pawl were properly adjusted.[3] The machine was set on automatic mode. When the cycling motion began, McHargue, standing at the front of the machine, noticed that only four parts were dropping from a mold which should have been producing eight parts per cycle. Upon inspection, he found that plastic parts were stuck in four of the eight cavities.

With the front gate closed, and with the machine still cycling, McHargue went to the rear of the machine to adjust the mold temperature and to remove the stuck parts. The temperature control was located at the rear of the machine, and it would also be easier to reach the stuck parts from that location. Once at the rear of the machine, McHargue adjusted the temperature, a task which normally takes 30 seconds to two minutes. After the temperature adjustment was made, McHargue opened the rear gate and the machine stopped cycling. He then reached into the mold to loosen the four stuck parts. At this point, McHargue

3. If the mold closed on McHargue's hand when the front safety gate was open, the mechanical safety device in question must not have been properly adjusted for the mold being used. McHargue testified that the mechanical safety bar was adjusted each time the mold was changed. That is to say, whenever a supervisor set up a new mold, it was that supervisor's responsibility to check the metal bar and pawl. Additionally, McHargue never tested the other safety devices because he did not understand it to be his responsibility. He was not aware that the safety devices were ever periodically tested by anyone at Denver Plastics. With regard to checking these devices, the warning sign affixed to the front of the machine stated that the safety devices associated with the front and rear gate were to be checked "daily" and each time a mold was changed.

became aware that the front safety gate had been opened. His assistant, Mary Ellen French, who was standing at the front of the gate, inquired as to whether he needed any help. McHargue replied that he did not because he was almost finished. When he had removed three of the four plastic pieces, the mold closed without warning, crushing his hand.

Upon seeing the mold close and hearing McHargue scream in pain and shout for help, French tried frantically to open the mold. A forklift operator also responded to the emergency. Eventually, although it is unclear how, the mold was opened and McHargue's hand was released. He was flown by helicopter to a hospital in Greeley.

It is unclear on this record whether the front safety gate was open or closed at the time the mold closed on McHargue's hand. The only two eyewitnesses to the event, McHargue and French, have testified that they are certain that the front gate was open. This testimony is corroborated by the fact that French testified that she saw the mold close, and both French and McHargue testified that they were speaking to each other immediately before the mold closed (although French may have turned away for a second). Yet it is impossible for persons located at the front and rear of the machine to see each other or converse if the front safety gate is closed.

In spite of this evidence, two of the experts investigating the case have concluded that "the most probable scenario" for the accident is that the safety gate was closed by an unknown employee seconds before the accident. This conclusion is based on the fact that these experts are unable to explain how the machine in question could have closed with the front gate open. While this conclusion flies in the face of otherwise uncontradicted and consistent eyewitness testimony, it does represent some evidence that McHargue and French are mistaken and that the front safety gate was closed. Thus, the issue of whether the front gate was open or closed at the moment McHargue was injured cannot be resolved at this juncture.

## DISCUSSION

■ A motion for summary judgment may only be granted if the pleadings, affidavits, and other documentation submitted to the court demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Because it is a drastic remedy, the movant must establish entitlement to summary judgment beyond a reasonable doubt. *Norton v. Liddel,* 620 F.2d 1375, 1381 (10th Cir.1980). All pleadings, documents, and affidavits must be construed liberally in favor of the party against whom the motion is made. *Mustang Fuel Corp. v. Youngstown Sheet and Tube Co.,* 516 F.2d 33, 36 (10th Cir.1975). Thus, where different inferences can be drawn from the documentary evidence submitted, the law is clear that summary judgment should not be granted. *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980).

### I. Strict Liability

#### A. The Standard Under § 402A

■ Section 402A of the Second Restatement of Torts has been adopted in its entirety by the Colorado Supreme Court as being the law in Colorado. *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983, 987 (1975). That section provides as follows:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1) (1965).

It is clear that Section 402A applies with full force where the alleged defect is in the product's *design,* rather than its manufacture or assembly. *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276, 280

(1978). "Design" refers to that part of the manufacturing process requiring decisions as to general structure, shape, size, material, and methods or processes of construction. *Id.* 583 P.2d at 281. It is important to note that "the failure to provide safety devices can be the basis of a § 402A design defect case." *Id.* at 280 (and cases cited therein).

██ Strict liability, however, is not the equivalent of absolute liability, and the fact that an accident may occur in connection with the use of a product does not necessarily mean that the manufacturer is liable. *Kysor Indus. Corp. v. Frazier,* 642 P.2d 908, 911 (Colo.1982). While some courts have eliminated the "unreasonably dangerous" requirement, it is well established that under Colorado law a plaintiff must prove *both* that the product was defective and that it was unreasonably dangerous in order to prevail under Section 402A. *Kysor,* 642 P.2d at 911, n. 1; *Union Supply,* 196 Colo. at 171, 583 P.2d at 282, n. 5. Thus, Section 402A liability attaches "where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A, comment g. The question of whether a product is defective and unreasonably dangerous is generally an issue for the jury. *Kysor,* 642 P.2d at 912–13; *Union Supply,* 583 P.2d at 279; *Martinez v. Atlas Bolt & Screw Co.,* 636 P.2d 1287 (Colo.App.1981).

██ In the present case, plaintiffs claim that the design of the Blue 300 was defective, rendering the machine unreasonably dangerous. Specifically, plaintiffs complain that the safety features designed into the machine were inadequate. In their response, plaintiffs have submitted expert testimony (which presumably will be proffered at trial) to the effect that numerous other safety devices that are both techncially and economically feasible are commonly found in the design of similar plastic injection molding machines. Since the failure to provide adequate safety devices can be the basis of liability under Section 402A, a jury could conclude on the basis of such evidence that the design of the machine in question was defective and unreasonably dangerous. Accordingly, the court will now consider the defenses asserted by Stokes in its motion.

*B. Failure to Heed Warnings and Instructions*

In its motion for summary judgment, defendant contends that plaintiff's action is barred as a matter of law because McHargue failed to follow the warnings and instructions affixed to the machine. Specifically, defendant relies on the undisputed facts that McHargue did not perform any tests of the safety devices on the morning in question and that he did not shut off the pump motor before placing his arm in the mold area by way of the rear safety gate. Stokes claims that if McHargue had complied with the signs requiring that the safety devices be checked and that the motor be turned off when working in the mold area from the rear, the accident would not have occurred.

Before addressing the legal issue of whether a plaintiff's failure to comply with a manufacturer's warning constitutes misuse of the the product as a matter of law, it is important to note that it has *not* been established that McHargue failed to heed the warning setting forth the procedure for checking safety devices or that performance of such procedure would have prevented the accident. This particular sign states that the procedure is to be performed "daily" and after the mold is changed. McHargue testified that it was not necessary for him to change the mold on the Blue 300 since the proper mold for that morning's production was already in place. When it is not necessary to change the mold, this sign merely requires that the tests be performed "daily," not necessarily every morning before using the machine. Thus, McHargue could have performed the safety check later that day and still have been in compliance with this instruction. Moreover, while McHargue testified that he was responsible for checking the adjustment of the metal bar and pawl after setting up a new mold, he testified that it was not his responsibility to perform the other tests described by this sign.

Furthermore, even if McHargue had performed this battery of tests on the morning

in question, it has not been established that this would have revealed the problem with the rear safety gate interlock. While one of the experts questioned on this matter did opine that these tests would have revealed the problem, this conclusion is difficult to accept for obvious reasons. Based on the evidence submitted thus far, the bypass of the electrical interlock associated with the rear gate was due to the miswiring of the timer. It is unclear whether the timer was miswired when it was manufactured or when it was subsequently repaired, but even it if was miswired at the latter time, it still would have been miswired for over nine months before the accident occurred. If the tests described in the warning sign were to be performed daily, they would have been performed numerous times during the period the timer was miswired. If the problem with the rear gate interlock was not detected during these tests, it would not have been detected even if McHargue had performed the tests on the date of the accident. Thus, even if the sign had specified that the tests should be performed before running the machine, and even if it had been McHargue's responsiblity to perform them, his failure to do so could still not be considered a cause of his injury because it has not been established that performance of these tests would have revealed the problem with the timer.

However, in contrast to the sign describing the procedure for testing the safety devices, it seems clear that McHargue failed to comply with the warning sign stating that the motor should be shut off before placing any part of the body in the mold area by way of the rear gate. It is undisputed that McHargue left the motor running when he went to the rear of the machine. Moreover, the experts are in agreement, and common sense would indicate, that the accident would not have occurred if the pump motor had been turned off. On this basis, then, it becomes necessary to consider the merits of defendant's legal theory.

The thrust of defendant's argument is that where a plaintiff's failure to follow warnings supplied with the product causes injury, the plaintiff's conduct constitutes misuse as a matter of law, barring any claim against the manufacturer under Section 402A. It is true that "misuse" of the product is a defense to a strict products liability claim in Colorado. *Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322 (Colo. 1986). In *Uptain,* the Colorado Supreme Court set out the elements of the defense of misuse. Specifically, "[a] manufacturer of a product is not legally responsible for injuries caused by a product if: (1) the product is used in a manner or for a purpose other than that which was intended [4] and which could not reasonably have been expected; and (2) such use rather than a defect, if any, in the product caused the plaintiff's claimed injuries." *Id.,* at 1325. An important requirement of the defense of misuse is that the product be put to a use that is unforeseeable.[5]

Having set forth the defense of misuse, Stokes next points to the rule that "where warning is given, the seller may reasonably assume that it will be read and heeded." *Uptain,* 723 P.2d at 1326 (adopting Restatement (Second) of Torts § 402A comment j as the rule in Colorado). On this basis, defendant contends that since a manufacturer may assume that warnings and instructions will be followed, a plaintiff's use of the product in contravention of such warnings is unforeseeable as a matter of law. Therefore, the argument goes, since Stokes did not intend for the machine to be used without the warnings and instructions being followed, and if such use is unforeseeable as a matter of law, McHargue's injuries were caused by a misuse of the product, barring any claim under Section 402A.

**4.** With regard to the requirement that the use be one not intended by the manufacturer, the concept of misuse in Colorado includes both the use of a product in a *manner* other than that which was intended, as well as use for a *purpose* other than that which was intended. *Uptain,* 723 P.2d at 1326; *Hickman v. Thomas C. Thompson Co.,* 644 F.Supp. 1531, 1534 (D.Colo.1986).

**5.** The Colorado Supreme Court has clearly held that putting the product to a use that was unintended by the manufacturer is only a defense to liability under Section 402A if the unintended use was also unforeseeable. *Uptain,* 723 P.2d at 1325; *Hickman,* 644 F.Supp. at 1534; *Jackson v. Harsco Corp.,* 673 P.2d 363 (Colo.1983).

■ After much consideration and a thorough review of the precedents in this jurisdiction, I find for a number of reasons that I cannot accept defendant's proposition that a plaintiff using a product in contravention of warnings given by the manufacturer is unforeseeable to such manufacturer as a matter of law. First, the case law in Colorado indicates that where it is established that the plaintiff used the product in contravention of a warning, the question of misuse is properly submitted to the *jury*. Second, the Colorado Supreme Court has held that, in determining whether a product is defective or unreasonably dangerous, the presence or absence of a warning is merely one factor of several to consider. Therefore, the mere presence of a warning on an ordinary product[6] is obviously not conclusive. Third, I believe that defendant misinterprets the scope of the restatement comments upon which its argument is based. Fourth, the very social policies upon which Section 402A is based mitigate against such a rule. Fifth, the few authorities that have actually considered the issue have held that warnings and instructions, even when they are adequate, are not a substitute for safe design.

The Colorado Supreme Court considered the mirror image of this argument less than two years ago in the *Uptain* case. There, the plaintiff, Tonya Uptain, had been employed as a housekeeper in a hospital. Uptain's supervisor had demonstrated the use of various cleaning compounds available for cleaning bathroom fixtures, including the proper use of Sani–Tate, a 23% hydrochloric acid solution manufactured by the defendant Huntington. At that time, Sani–Tate containers had labels warning users to avoid contact with the product because of potential chemical burns and to wash the skin area well if such contact occurred. Uptain was instructed to use a swab to apply Sani–Tate, and to periodically rinse the swab. According to her supervisor, Uptain was also instructed to wear rubber gloves, but she refused to do so. Annoyed by the fact that water dripped continuously from the cleaning swab, Uptain began to wring out the swab by hand after each rinse. As a result of this contact, she suffered severe burns to her hand. *Uptain*, 723 P.2d at 1323–24.

Uptain brought a products liability action against Huntington, but the jury returned a verdict in favor of the defendant. On appeal, Uptain argued that the trial court had erred in instructing the jury on the defense of misuse. She contended that a plaintiff using the product in the manner in which she did (in contravention of the manufacturer's warning) was foreseeable as a matter of law. The Supreme Court disagreed, and held that where a plaintiff disregards the warnings associated with a certain product, the defense of misuse is properly submitted to the jury. *Id.* at 1326.

The same argument was also considered by Judge Kane in ruling on a motion in limine in the case of *Hickman v. Thomas C. Thompson Co.*, 644 F.Supp. 1531 (D.Colo.1986). There, the court found that while the plaintiff was using the product for the purpose intended by the manufacturer, she may have been using it in contravention of the warnings given by the manufacturer, and therefore may have been using it in an unintended manner. Citing *Uptain*, the court refused to rule that plaintiff's manner of use was foreseeable as a matter of law, and therefore denied plaintiff's motion to strike the defense of misuse. *Id.* at 1535.

The Colorado Court of Appeals has also ruled that a failure to follow warnings does not constitute misuse as a matter of law. In *Peterson v. Parke Davis & Co.*, 705 P.2d 1001 (Colo.App.1985), a drug manufactured by the defendant was administered by a physician who failed to read the warnings contained in the package and in the Physician's Desk Reference. The court held that these facts created an issue for the jury as to whether the physician had used the drug in an unforeseeable manner. *Id.* at 1003.[7]

These several cases clearly indicate that a plaintiff's failure to heed a manufactur-

---

6. The rule may be otherwise for "unavoidably unsafe" products with "adequate" warnings.

*See* Restatement (Second) of Torts § 402A comment k.

7. In contrast, the Court of Appeals has also held

er's warning does not bar a Section 402A claim as a matter of law. Rather, *Uptain* and its progeny indicate that while the failure to comply with a warning raises the issue of misuse, the issue is properly reserved for the jury.

Secondly, the Colorado Supreme Court has recently held that the ultimate question in a products liability case, the question of whether the product at issue is defective and unreasonably dangerous, is necessarily a complex determination requiring that a number of factors be considered. In *Camacho v. Honda Motor Co.*, 741 P.2d 1240 (Colo.1987), the court listed seven factors that must be considered in making the determination. One such factor is the user's anticipated awareness of the dangers inherent in the product because of the existence of suitable warnings or instructions. *Id.* at 1247. Thus, while a manufacturer's warning is an important consideration, it is obviously not the only factor in the equation. It follows, then, that while the fact that Stokes supplied warnings with the Blue 300 is relevant and important, it is not dispositive of the issue of liability under Section 402A, and therefore cannot be the basis for summary judgment.

■ Third, I believe that defendant may have misinterpreted the breadth of the restatement comments upon which it so heavily relies. Stokes' entire legal argument on this point hinges on the last sentence of comment j to Section 402A, which states that:

> [a] product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous. Restatement (Second) of Torts § 402A comment j.

that a plaintiff who has been instructed by his employer on numerous occasions not to operate a product in a certain way, and who admitted that he knew and was fully cognizant of the dangers of operating it that way, cannot recover in strict liability when he operates the product in such a manner. *Shultz v. Linden–Alimak, Inc.*, 734 P.2d 146 (Colo.App.1986). This case is, of course, distinguishable from the case at hand, since there is no evidence that McHargue had been instructed by anyone at Denver Plastics of the need to shut off the pump motor when working by way of the rear gate or of the reasons for doing so.

However strongly this sentence may be worded, I am of the opinion that it assumes that the warning to which it is referring is adequate and proper. According to the Colorado Supreme Court, when a warning has been given, "[t]he issue a jury must consider is not whether the manufacturer furnished *any* instructions or warnings, but whether the instructions or warnings it did furnish were adequate." *Anderson v. Heron Eng. Co.*, 198 Colo. 391, 396, 604 P.2d 674, 677 (1979) (emphasis in original).[8]

Other Colorado cases, and even the other comments to Section 402A, when they refer to the defense of warning, or liability for failure to warn, uniformly refer to "adequate," or "suitable," or "proper" warnings and instructions. *E.g. Camacho*, 741 P.2d at 1247 "suitable warnings or instructions"; *Kysor Indus. Corp.*, 642 P.2d at 911 (manufacturer may be liable for placing product in stream of commerce without giving "suitable and adequate warnings or instructions"); *Moe v. Avions Marcel Dassault–Breguet Aviation*, 727 F.2d 917, 926 (10th Cir.1984) (referring to the duty to warn "adequately," interpreting Colorado law, and citing *Hiigel*, 544 P.2d 983, 987, for the same proposition); Restatement (Second) of Torts § 402A comment k (stating that the seller of an "unavoidably unsafe" product may avoid liability, but "again, with the *qualification* that [such products] are properly prepared and marketed, and *proper* warning is given") (emphasis added).

■ Thus, while warnings and instructions may be a defense to a Section 402A claim, they are *only* a defense where they are found to be proper and adequate. Such

8. With regard to adequacy, a manufacturer may be required to warn of the consequences if certain instructions are not followed, or the dangers that may arise from improper use. *Anderson*, 198 Colo. at 395, 397, 604 P.2d at 676, 678. Several courts have held that a warning, in order to be found adequate and proper, must communicate the specific danger and risk, including the likelihood and severity of injury. *See* L. Bass, *Products Liability; Design and Manufacturing Defects* § 10.20 (1986) (hereinafter *Design Defects*).

a rule is consistent not only with the law in Colorado, but also with the policies underlying the very existence of Section 402A, since any other interpretation would render even the most unsafe product immune from the reach of 402A so long as it bore a warning, without regard to how small, inconspicuous, or otherwise inadequate that warning might be. The suitability of any particular warning, in turn, will be based upon a number of circumstances,[9] such as the prominence of the warning, the type of product at issue, and the type of employee expected to use the product.[10] Such a determination, bearing upon all the evidence in the case, is uniquely inappropriate to summary disposition on the limited record before me, and is therefore properly reserved for the jury.

Fourth, some familiarity with the policy concerns underlying the adoption of Section 402A, as well as the rule that summary judgment is generally frowned upon, make me reluctant to embrace a new rule that strict products liability claims are barred on their face whenever it can be shown that the plaintiff failed to heed a warning. Section 402A is based upon the premise that the burden of accidental injuries caused by products be placed upon those who market them, and be passed along as a cost of production. *Camacho,* 741 P.2d at 1246 (citing Restatement (Second) of Torts § 402A comment c). The concept is that the user is entitled to protection at the hands of someone, and that the proper persons to afford it are those who make a profit casting the product into the stream of commerce. *Id.* In light of such concerns, the Colorado Supreme Court has recently reaffirmed the principle that "[t]he primary focus must remain upon the nature of the product under all relevant circumstances rather than upon the conduct of either the consumer or the manufacturer." *Id.* at 1246. Yet, acceptance of defendant's argument would be to improperly place the primary focus upon the conduct of the consumer rather than upon the nature of the product.

The failure to heed a warning, in and of itself, arguably constitutes contributory negligence. However, since liability under Section 402A is not based upon fault, the contributory negligence of the plaintiff is irrelevant and not a defense. *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978); Restatement (Second) of Torts § 402A comment n. While assumption of risk *is* a defense, it requires some showing that the plaintiff subjectively understood the risks and voluntarily proceeded in the face of them. *Id.* On the record before me, there is no evidence that plaintiff actually understood the risks attendant to leaving the motor running, and voluntarily took a chance. Mere failure to heed a warning, without consideration of these other circumstances, does not make out the defense of assumption of risk. Therefore, the adoption of a blanket rule that there may be no recovery in any case where a plaintiff fails to heed a warning, without more, cannot be accepted because it would be the equivalent of summary dismissal of a Section 402A claim on the basis of contributory negligence.

Fifth, I note that to reject defendant's argument is to accept the proposition that warnings and instructions may not be a substitute for safe design. I find this proposition to be entirely consistent with the purposes and policy concerns that are the foundation of liability under Section 402A. Moreover, the few authorities I am aware of that have actually and squarely addressed this specific proposition have held that it is indeed the law. *E.g. Uloth v. City Tank Corp.,* 376 Mass. 874, 880, 384 N.E.2d 1188, 1192 (1978) ("If a slight change in design would prevent serious, perhaps fatal, injury, the designer may not avoid liability by simply warning of the possible injury."); Bass, *Design Defects* § 10.02 ("Warnings and instruction manuals can be an important element in the

---

9. For example, expert testimony was submitted to the effect that shutting off the pump motor when working on the machine from the rear is not practical, such that the warning is commonly ignored. This may be a circumstance bearing upon the suitability of the warning given.

10. For example, evidence was submitted to the effect that some employees may not have been literate.

effort to reduce the risk of injury. They are not, however, a substitute for safe design and careful manufacture. [...] Warnings should only be used when there is no economically or technologically feasible design alternative. Some courts have held that if a hazard could have been designed out of the product, then a warning should not relieve the manufacturer of responsibility."); Philo, *New Dimensions in the Tortious Failure to Warn*, 17 trial 40, 42 no. 11 (Nov. 1981). The rationale is that warnings are not effective in eliminating injuries due to instinctive reactions, momentary inadvertence, or forgetfulness on the part of a user. One of the primary purposes of safety devices is to guard against such foreseeable situations. *Uloth*, 376 Mass. at 880, 384 N.E.2d at 1192; Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age*, 61 Cornell L.Rev. 495, 509 (1976).

In sum, it appears to me that adoption of a rule to the effect that strict liability claims must be summarily dismissed whenever it can be shown that the plaintiff failed to heed a warning would work a great change in the law of strict products liability as it exists in Colorado at the present time. Moreover, I am of the opinion that such a ruling would be fundamentally at odds with the very policy concerns upon which the adoption of Section 402A was based. I am unconvinced that the Colorado Supreme Court would be inclined to take such a great leap backwards. Since this court is not, defendant's motion for summary judgment on this first ground must be denied.

**C. Misrepair by a Third Party**

Defendant next contends that the sole cause of the accident was the fact that the timer was miswired, and that such miswiring occurred when the timer was repaired by TESSCO. Citing a number of cases for the legal principle that a manufacturer cannot be held liable where the product at issue is misrepaired by some third party, and such misrepair is the proximate cause of the injury, Stokes moves for summary judgment in its favor on this ground as well. Without addressing the validity of this rule of law, I find that this argument fails to support summary judgment in defendant's favor because it has not been established that the timer was misrepaired by a third party or that the miswiring was the proximate cause of the accident.

From the evidence submitted on this motion, it does appear to be undisputed that a particular timer was miswired and that such miswiring could have caused the failure of the electrical interlock associated with the rear gate. Additionally, there is some evidence from which a jury might conclude that such timer had been sent out to a third party, possibly for repairs, in May of 1983.[11] Beyond this, nothing short of speculation has been offered on the issue of when the timer was miswired.[12] Since there is no dispute that the timer was in fact miswired, the jury would be free to conclude that the timer was miswired when it was manufactured or when it was subsequently repaired. Should the jury conclude the former, Stokes could well be liable under Section 402A, as well as in negligence.[13]

11. The only evidence proffered on this issue was the fact that a label on the rear of the can for this timer indicates a Denver Plastics post office number dated 5/25/83, suggesting that the timer was sent out to someone on this date. It is not clear from this evidence for what purpose (e.g. testing, repair) the timer was sent or to whom it was sent.

12. It is true that if the timer was miswired when originally manufactured, the problem would have had to go undetected for a number of years. This fact caused one expert to speculate that, "within a reasonable degree of probability," the timer was miswired when repaired.

However, if the unit was miswired when repaired, the problem would still have gone undetected for ten months or so, indicating that the miswiring was obviously a condition difficult or impossible to detect. Thus, since the jury is at liberty to discount opinion testimony, and since no other evidence was offered on this point, the jury would be free to draw whatever inference it may from the fact that the timer was miswired.

13. As to the liability in negligence of a manufacturer that incorporates a defective component part into its product, *see generally* Annot., 3

Additionally, I remain unconvinced on this limited record that such miswiring, even if it was the product of repair by a third party, was the proximate cause of McHargue's injuries. As noted above, it is unclear whether the front safety gate was open or closed when this accident occurred. If it was open, then the accident was at least caused in part by the malfunction of the three safety devices associated with the front safety gate and not solely by the fact that the timer was miswired.

Accordingly, since material issues of fact remain as to when the timer was miswired, and whether such miswiring was the proximate cause of plaintiff's injuries, defendant's motion for summary judgment on this ground must be denied.

### D. Proof in a Design Defect Case

Defendant next contends that the proof to be offered by plaintiffs at trial will be insufficient to support their claims as a matter of law. Specifically, it is undisputed that plaintiffs intend to prove that the design of the Blue 300 was defective and unreasonably dangerous by presenting evidence of safety devices and alternative designs which would have rendered the machine less dangerous.[14] Such evidence is to be presented by way of expert testimony, which also will show that such alternatives have been common in the industry since the machine in question was manufactured or that such alternatives are otherwise technologically and economically feasible. Additionally, the experts will testify generally that the design of the Blue 300 is defective and unreasonably dangerous. Defendant claims that liability under Section 402A does not attach merely because the existence of an extra safety device would have rendered the product less dangerous, and moves for summary judgment in its favor on this ground.

When a plaintiff claims that the design of a particular product is defective, the issue before the court is not whether some added safety device would have rendered the product less dangerous. *Curtis v. General Motors Corp.*, 649 F.2d 808, 811 (10th Cir.1981). Rather, the question before the court is whether the design of the product is defective and unreasonably dangerous. *Id.* Nevertheless, it is clear that a plaintiff proves that a particular design is defective by relying upon expert testimony to that effect and by presenting evidence of feasible alternatives. *Weakley v. Fischbach & Moore, Inc.*, 515 F.2d 1260, 1268–69 (5th Cir.1975) (*See* discussion *infra* at 1441); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1322, 1326 (1978) ("[P]laintiff's burden in a design defect case includes a showing that there was an 'alternative, safer design, practicable under the circumstances,' or that 'in terms of cost, practicality and technical possibility, the alternative design was feasible' ") (citations omitted); W. Prosser and W. Keeton, *Prosser and Keeton on Torts* § 103 at 715 (5th ed. 1984) (hereinafter *Prosser on Torts*) ("Types of proof that have been utilized in proving [design defects] include ... expert evidence, especially opinion evidence, relating to (1) the cause for an occurrence and (2) the technological possibility and feasibility of an alternative way to design the product without so much danger."); Bass, *Design Defects*, § 4.15.

In Colorado, the standard for determining whether the design of a product is defective and unreasonably dangerous is not whether the product is more dangerous than the ordinary user or consumer would expect, but rather whether the magnitude of the danger outweighs the utility of the design. *Camacho*, 741 P.2d at 1246. As already noted, the Colorado Supreme Court has listed a number of factors that should be considered by the jury in such a case. These factors include "[t]he availability of a substitute product which would meet the same need and not be as unsafe" and "[t]he manufacturer's ability to eliminate the unsafe character of the product without im-

---

A.L.R.3d 1016 (1965); Restatement (Second) of Torts § 395 comments e-g, m.

**14.** Defendants also assert in their defense that the design of the Blue 300 was in compliance with the relevant government standards for such machines. Even assuming this to be the case, such compliance does not provide a complete defense, but merely raises a rebuttable presumption that the product at issue is not defective. *See* Colo.Rev.Stat. § 13–21–403(1) (1973).

pairing its usefulness or making it too expensive to maintain its utility." *Id.* at 1247. Such factors obviously contemplate consideration by the finder of fact of alternative designs of the same product and consideration of safety devices that are technically and economically feasible.

■ With regard to a finding of defectiveness based upon design alternatives, however, the courts have developed a qualification to ensure that such a finding not be based upon outlandish or unrealistic alternatives developed in hindsight. Specifically, before the court may submit a defective design case to the jury, it must consider whether the alternative design has also been shown by the plaintiff to be "practicable" or "feasible." *Wilson,* 577 P.2d at 1326.[15] By "feasible" is meant a finding that the proposed change is technologically possible and that any additional cost is outweighed by the magnitude of the danger that could be avoided. *Prosser on Torts* § 99 at 700.

Defendants rely principally upon *Weakley v. Fischbach & Moore,* 515 F.2d at 1260, 1267, for the proposition that "the defendant is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe."[16] While true, this does not mean that a finding of defectiveness cannot be based in part upon evidence that other feasible designs were available and common in the industry. As the portion of the opinion from which this quoted statement has been removed makes clear, the *Weakley* court was merely emphasizing the rule set forth above that the primary issue before the court is not the existence of alternatives, but rather whether the design at issue is unreasonably dangerous. *See Weakley,* 515 F.2d at 1267–68. After finding that the evidence offered by the claimant was inadequate, the court went on to set forth the kind of evidence that *is* acceptable and *will* sustain a claimant's burden in a design defect case. Specifically, the court referred to evidence that the design deviated from industrial practice, evidence that alternative designs had been adopted by other designers for use in similar equipment, and evidence in the form of expert testimony to the effect that the design at issue was unreasonably dangerous. *Id.* at 1268–69.

Applied to the present case, the numerous authorities cited above clearly indicate that the evidence plaintiffs propose to present at trial would be sufficient to sustain a finding by the jury that the design at issue was indeed defective. First, plaintiffs have tendered expert opinion testimony to the effect that the design at issue was defective for a number of reasons.[17]

15. It may also be necessary for the court to determine that the alternative design was "commercially available." Bass, *Design Defects* § 4.15 (citing *Wilson* ).

16. I note that defendant cites three cases from this jurisdiction for the same proposition. *See Curtis v. General Motors Corp.,* 649 F.2d 808 (10th Cir.1981); *Gates v. Ford Motor Co.,* 494 F.2d 458 (10th Cir.1974); *Davis v. Caterpillar Tractor Co.,* 719 P.2d 324 (Colo.App.1985). These cases are surprisingly similar on their facts; in each, the product at issue was a vehicle, and the plaintiff's claim was that the vehicle was defective because the manufacturer failed to install a rollbar or otherwise provide protection in the event of a rollover. The court in each case did indeed rule that the mere failure to provide a safety device such as a rollbar did not, of itself, automatically indicate that the design at issue was defective. However, these cases are distinguishable from the case at bar in that in these cases the claimant was also the person who made the decision to purchase the product, was aware of and had the option to purchase the overhead safety feature, and made the informed choice to purchase the more dangerous model. Thus, the broad holding of these cases is that a manufacturer is not liable to a *purchaser* when the former provides a range of choices with varying degrees of safety, but the purchaser fails to establish that the particular model chosen is unreasonably dangerous. *Id.* Moreover, a full reading of these cases indicates that, like the others cited above, they merely stand for the proposition that the issue is not whether an alternative design exists, but whether the design before the court is defective and unreasonably dangerous. They do not stand for the proposition that evidence of alternative designs is insufficient to support a finding that the design in question is defective. *Id.*

17. Plaintiffs' experts contend that the design of the Blue 300 was defective and unreasonably dangerous because the single interlock associated with the rear gate was inadequate. They argue that failures in the electronic circuitry (resulting in a by-pass of the interlock) are com-

**1442**

Second, plaintiffs have offered expert testimony describing a number of safety features that would have prevented the accident, all of which are technologically and economically feasible, and many of which were designed into similar machines and in common use when the Blue 300 was manufactured.[18] Such evidence as this seems to be precisely what is contemplated by the cases and other authorities noted above. Thus, should this type of evidence actually be offered and received at trial, I see no reason why it could not support a finding of liability. For this reason, defendant's motion for summary judgment in its favor on this last ground must be denied.

## II. Negligence and Warranty

In addition to their allegation that the design of the Blue 300 was defective and unreasonably dangerous, plaintiffs have also asserted claims against Stokes sounding in warranty and negligence. Although it is styled as a motion for summary judgment (not partial summary judgment), defendant's motion fails to address the issues of warranty and negligence. Since defendant has chosen not to discuss these issues, neither will I.

## CONCLUSION

Accordingly, IT IS ORDERED that defendant's motion for summary judgment in its favor be, and the same hereby is, DENIED.

mon and foreseeable in such a complex circuit. Moreover, they claim that it is foreseeable that a plug-in component part could be tampered with or modified.

18. Plaintiffs' experts describe a number of common or feasible safety features, including (1) a second interlock on the rear gate that would shut off the pump motor, (2) a second hydraulic interlock similar to the one associated with the front gate, (3) a mechanical interlock that does not require manual adjustment to function, and (4) a power shut-off switch located at the rear of the machine.