### CHRISTOPHER S. LOOK'S CASE.

Suffolk.    October 2, 1962. — November 6, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
& SPIEGEL, JJ.

*Workmen's Compensation Act,* Incapacity.

A conclusion in a workmen's compensation case that the employee became
unable to work at his trade as a plumber, and thereby sustained an im-
pairment of his earning capacity entitling him to partial disability
compensation, was not warranted on the record including medical testi-
mony as to a certain skin disease suffered by him which might be re-
activated by exposure to leadite or lead derivatives and evidence as to
the circumstances of his changing his occupation.

CERTIFICATION to the Superior Court of a decision by the
Industrial Accident Board under the Workmen's Compen-
sation Act.

The case was heard by *Spring,* J.

*John J. Norton (Joseph F. O'Connell, Jr.,* with him) for
the employee.

*Edmund Z. Dymsza* for the insurer.

KIRK, J.    The employee (Look) appeals from a decree
of the Superior Court wherein he was denied the partial in-
capacity compensation which the reviewing board had or-
dered paid to him at the rate of $10 a week commencing
September 29, 1958.    The denial was on the ground that
"there is no medical proof that the employee could not en-
gage in his trade as a plumber."

The insurer has not appealed.    In consequence, no ques-
tion is raised as to that part of the decree which awarded
total incapacity compensation to Look for stated intermit
tent days between July 17, 1959, and February 13, 1961,
which in the aggregate were the equivalent of five and six-
sevenths weeks.[1]

[1] In the order directing the insurer to pay partial incapacity compensation,
the board excluded the five and six-sevenths weeks for which it ordered that
total incapacity compensation be paid.    The judge, in his decree, which denied
the partial incapacity claim, ordered payment of the five and six-sevenths
weeks of total incapacity.

We summarize the record, adhering to the chronology of events for the purposes of clarity. On August 5, 1958, Look suffered burns from hot leadite, a substance used in his work as a plumber on Martha's Vineyard. He received medical treatment from the nearest physician at Oak Bluffs for "some days." Total incapacity compensation (G. L. c. 152, § 34) plus dependency benefits (G. L. c. 152, § 35A) were paid to Look from August 22, 1958, to September 29, 1958, excepting two days in that period when he worked. On September 29, 1958, Look signed an assent to discontinuance of compensation (G. L. c. 152, § 29) and on October 1, 1958, commenced work as the driver of an oil truck. While employed as an oil truck driver, he received total disability compensation, attributable to his injury of August 5, 1958, for twelve intermittent days through July 17, 1959.

Sometime in August, 1959, Look consulted his family physician, Dr. Nevin, in Edgartown. Dr. Nevin's testimony before the single member on October 6, 1960, was in substance as follows: He received a medical history from Look that, following his treatment by the physician at Oak Bluffs in 1958, he broke out all over with hives, itching and swelling and literally moved around on his hands and knees because the soles of his feet were so tender. Dr. Nevin's diagnosis of this condition was erythema multiforme. It is an irritation or rash usually found on the skin of the body other than the torso. He had noted the condition at times in the twelve or fourteen recorded visits Look had made to him. The cause is said to be unknown, but in fact it is due to an allergy. It is caused either by bacterial poisons or chemicals. Although the particular offending agent may be difficult to detect, Dr. Nevin felt that leadite played some part in the erythema multiforme, that it caused the redness of the skin, and that Look is peculiarly susceptible to any insult (medically speaking) from "some poison [which] we might say . . . might trigger it again in that direction." The erythema he saw in Look is not necessarily disabling. There are degrees of severity. In his direct examination Dr. Nevin had testified, as to prognosis, that the worst of

Look's illness was over; he would probably break out with itching and rash at unforeseen times but should not lose any time from work; he is "over the hump unless he is exposed to one of the lead derivatives again." His testimony, as finally left on cross-examination was that Look now is all right. A doctor would not find anything wrong. It is fair to say that the original condition does not reactivate itself but must be reactivated by some new agent before his system has had time to build up resistance to an aggravation. It would be impossible to determine what new agent would be playing a part in reactivating the whole condition if this should occur. The prognosis in this kind of case for eventual recovery is good.

Look's average weekly wage as a plumber was $90. As an oil truck driver, he started at $75 dollars a week and now gets $80 a week. In all, between July 17, 1959, and October 6, 1960, he was unable to work on twenty-eight days because of the skin irritation.[2]

The board found that Look "as a result of his industrial injury . . . is partially disabled because he is unable to work at his trade as a plumber, as testified to by Dr. Nevin." The findings of fact made by the single member and adopted, as here, by the reviewing board are final if they are supported by the evidence and not tainted by some error of law. *Sulham's Case*, 337 Mass. 586, 589.

The insurer, in attacking the finding of the board quoted in the preceding paragraph, quite correctly points out that nowhere in the record does it appear that Dr. Nevin testified that Look was unable to work at his trade as a plumber. The insurer argues that the absence of this testimony leaves the finding of the board as to partial incapacity without evidential support. Look, on the other hand, argues that the board could draw the inference of partial incapacity from the entire record. We incline to the view, for

---

[2] In a letter on February 13, 1961, Look informed the board that after the hearing on October 6, 1960, he was out of work for thirteen days. These, added to the twenty-eight intermittent days testified to at the October 6, 1960, hearing, account for the total incapacity compensation for five and six-sevenths weeks which the board ordered paid to Look, and which the court decreed must be paid.

reasons presently to be stated, that in the circumstances here disclosed, the insurer's contention is sound, and the decree of the judge denying the award for partial incapacity compensation was right.

This court has frequently stated, " 'Incapacity for work resulting from the injury' is the statutory basis upon which a claim must be based for total, permanent and total, or partial disability. . . . Compensation is awarded not for the injury as such but rather for an impairment of earning capacity caused by the injury. An injury to be compensable must be one which lessens the employee's ability to work." *Zeigale's Case,* 325 Mass. 128, 129–130, and cases cited. *Garrigan's Case,* 341 Mass. 413, 416–417, and cases cited. The question presented, therefore, is whether the record can support a finding that Look's original injury has lessened his ability to work as a plumber. With certain exceptions not here material (see, for example, cases cited and discussed in *Lovely's Case,* 336 Mass. 512) the causal relation between the original injury and the alleged incapacity is a matter beyond the common knowledge and ability of the layman and must be established by expert medical testimony. *Josi's Case,* 324 Mass. 415, 417–418. *Sevigny's Case,* 337 Mass. 747, 749. We think that Dr. Nevin's testimony as finally left, fairly interpreted, is reducible to two propositions: (1) subsequent exposure to leadite or lead derivatives might reactivate the erythema multiforme; (2) an attack of erythema multiforme varies in severity — it may be, but is not necessarily, disabling.

A conclusion, based exclusively on either or both of these propositions, that Look is unable to continue his work as a plumber because of a susceptibility to erythema multiforme is, in our opinion, a conclusion based on conjecture. A medical opinion, however phrased, which indicates only a possibility of a causal connection between the injury and the claimed incapacity is not an adequate basis for an award. *Josi's Case,* 324 Mass. 415, 418. *Hachadourian's Case,* 340 Mass. 81, 86. In summary, we think that positive medical testimony on the specific issue of causal relation

was necessary to justify the finding of the board. The testimony was not forthcoming. Without it the finding cannot stand.

Furthermore, the absence of positive medical testimony as to the alleged partial incapacity impresses us with special significance in review of the entire record. Look testified that on October 1, 1958, he had ''given that occupation [plumbing] up.'' There is nothing, however, to suggest that the injury of August 5, 1958, was a factor in Look's decision to change employment. He did not consult Dr. Nevin until August of 1959. The diagnosis was thereafter made. There is no intimation that Look himself was aware or made aware by others of any peculiar susceptibility to subsequent exposure to lead derivatives which made it advisable for him to change his occupation. For all that appears, his change of employment may have been seasonal, or otherwise not related to his injury. While circumstances showing that the employee voluntarily changed his job after injury will not, as a matter of law, prevent a finding of partial incapacity, *Bajdek's Case,* 321 Mass. 325, 329, there must be, as there was in *Bajdek's Case,* specific medical testimony that the employee's earning capacity had been definitely impaired. *Bajdek's Case,* 321 Mass. 325, 328.

*Decree affirmed.*