GEORGE T. LALLY, THIRD, & others[1] vs. VOLKSWAGEN
AKTIENGESELLSCHAFT & others.[2]

No. 96-P-737.

Hampden. December 4, 1997. - August 18, 1998.

Present: WARNER, C.J., PERRETTA, & BECK, JJ.

*Practice, Civil,* Judgment notwithstanding verdict, Instructions to jury,
Discovery, Judicial discretion. *Negligence,* Proximate cause, Expert
opinion, Manufacturer of motor vehicle, Design. *Evidence,* Videotape,
Scientific test, Relevancy and materiality, Judicial discretion. *Deceit.*
*Consumer Protection Act,* Unfair or deceptive act, Warranty. *Warranty.*
*Escrow.*

In a product liability action involving the issue of the crashworthiness of a
motor vehicle, the judge did not err in granting the defendants' motion for
judgment notwithstanding the verdict where the plaintiffs had failed to
present evidence at trial sufficient to persuade a reasonable jury that the
minor plaintiff's injury was caused by impact with the interior of the motor
vehicle as alleged in the complaint. [321-326]

Discussion of the rationale of liability in automobile crashworthiness cases
articulated in *Fox* v. *Ford Motor Co.,* 575 F.2d 774 (10th Cir. 1978), and
*Mitchell* v. *Volkswagenwerk AG,* 669 F.2d 1199 (8th Cir. 1982), and
distinguishing the *Fox-Mitchell* approach from that stated in *Huddell* v.
*Levin,* 537 F.2d 726 (3d Cir. 1976). [328-330]

In a product liability case involving the crashworthiness of an automobile, the
judge properly instructed the jury in conformity with the rationale of the
*Fox-Mitchell* approach and his instructions were adequate. [326-328]

At the trial of a product liability case, the judge correctly ruled that videotape
evidence and a computer animation were not within the scope of pretrial
discovery orders and that the items were not excludable from evidence at
trial for alleged violation of those orders; further, the plaintiffs were not
prejudiced by any late disclosure of the tapes, in the circumstances.
[330-331]

In a civil action, a videotape introduced through an expert, demonstrating the
use of computers to predict and reconstruct accidents, was properly admit-
ted with appropriate instructions to the jury to assist them in understanding
the expert's testimony. [331]

At a civil trial, the admission in evidence without objection of a visual

---

[1] George T. Lally, Jr., Ernest Lally, and Joyce Lally.

[2] Volkswagen of America, Inc., and Lipman Motors, Inc.

representation of the defendants' expert witness's testimony, consisting of a brief animation, was merely cumulative of other evidence and could not have prejudiced the plaintiffs. [331-332]

In a product liability action involving the crashworthiness of an automobile, a videotape of a sled test involving an exemplar vehicle offered by the defendants was properly admitted in evidence, where the videotape was relevant to illustrate the defense expert's opinion testimony, was similar enough to the accident conditions in question to allow the jury to draw material inferences, and was not likely, in the circumstances, to have misled or confused the jury. [332-334]

In a civil action in which the plaintiff alleged that her excessive use of prescription narcotics and alcohol and the subsequent deterioration of her condition was causally related to injuries she suffered in an automobile accident, the judge properly allowed the jury to consider, with appropriate and forceful instructions, the plaintiff's preaccident substance abuse on the issue of causation. [334-335]

In a civil action, the judge correctly dismissed certain of the plaintiffs' claims at the close of the plaintiffs' evidence, where the plaintiffs failed to establish a causal relationship between the alleged acts or omissions of the defendants and the plaintiffs' injuries on those claims. [335]

In claims brought under G. L. c. 93A, the judge's findings of fact and rulings of law were supported by the evidence and were not clearly erroneous; the judge correctly entered judgment in favor of the defendants. [335-337]

In a civil action, the judge correctly ordered the plaintiff to return to the defendant funds the defendant had advanced to the plaintiff for the payment of the expenses of an expert witness who was never deposed, who never testified, and who had not incurred any expenses on account of the litigation. [337-339]

CIVIL ACTION commenced in the Superior Court Department on November 15, 1985.

The case was tried before *Daniel A. Ford*, J.

*Louis Kerlinsky* for the plaintiffs.

*Regina E. Roman* for Volkswagon Aktiengesellschaft & another.

*Frank Yesu* for Lipman Motors, Inc., was present but did not argue.

WARNER, C.J. This product liability case involves claims for personal injuries suffered by Joyce Lally and her six month old son, George T. Lally, Third (George), when the 1971 Volkswagen Karmann Ghia automobile Joyce was driving was involved in a collision with a 1974 Oldsmobile Cutlass. Joyce; George; Joyce's husband and George's father George T. Lally, Jr. (George Jr.); and Ernest Lally (George's brother), filed a lawsuit against Volkswagen of America, Inc., Volkswagen Ak-

tiengesellschaft (collectively referred to as Volkswagen), and Lipman Motors, Inc. (Lipman) alleging, among other things, breach of warranty, negligence, deceit, and violation of G. L. c. 93A, in connection with the design and sale of the Karmann Ghia. The case was a so-called "crashworthiness" case, in which the plaintiffs alleged that, as a result of certain design defects in the vehicle, Joyce and George were more seriously injured in the accident than they otherwise would have been.[3, 4] Specifically, the plaintiffs claimed that as the result of a defective design, the glove box door in the Karmann Ghia opened in the course of the accident, that George moved forward into the open door, and that the impact with the door's narrow edge caused his spinal injuries. They also alleged that as a result of the accident, Joyce's head struck the A-pillar, the metal pillar between the front windshield and the side window of the vehicle, and that her brain injury was caused by, and made worse as a result of, the lack of padding on the A-pillar.

After a Superior Court jury trial that lasted nearly five weeks, the jury returned verdicts in favor of the defendants on Joyce's claims of breach of warranty,[5] finding, in answer to a special question, that any defect in the vehicle was not a substantial contributing factor to her injuries.[6] The jury found in favor of George on his claims of negligence and breach of warranty and awarded total damages of $750,000 to him. The jury further awarded damages of $650,000 to George Jr. for medical and

---

[3]Restatement (Third) of Torts: Products Liability § 16 comment a, at 236 (1998), states that "[l]iability for increased harm arises most frequently in automobile crashworthiness cases . . . . Typically, the plaintiff is involved in an automobile accident caused by conduct or circumstances other than a product defect. The plaintiff would have suffered some injury as a result of the accident even in the absence of the claimed product defect. However, the plaintiff contends that the injuries were aggravated by the vehicle's failure reasonably to protect occupants in the event of an accident."

[4]Most of the 107 counts of the diffuse complaint were dismissed prior to trial. At the close of the plaintiffs' evidence, the judge directed verdicts in favor of the defendants on several of the remaining claims, including all counts for negligent infliction of emotional distress, deceit, and failure to warn, and reserved the remainder of the defendants' motions for directed verdicts.

[5]Joyce's negligence claims had previously been dismissed.

[6]The special questions concerning breach of warranty in the design of the vehicle were not separately submitted for the claims of George and Joyce, notwithstanding the fact that different alleged defects were involved in each claim. Accordingly, it is not clear whether the jury found that the A-pillar's design was defective.

related expenses, and $35,000 for loss of consortium. Loss of consortium damages in the amount of $80,000 were also awarded to Joyce.

On June 22, 1990, the trial judge heard arguments on a number of posttrial motions and on the plaintiffs' c. 93A claims.[7] He subsequently granted Volkswagen's motion for judgment notwithstanding the verdict and conditionally granted a new trial pursuant to Mass.R.Civ.P. 50(c), 365 Mass. 815 (1974), on George's claims, on the ground that there was insufficient evidence to support a finding that George's injuries were caused by any alleged defect in the Karmann Ghia.[8] The judge also issued findings of fact and rulings of law on the c. 93A claims, and ordered judgment in favor of the defendants on those claims. The plaintiffs' motions for additur and for a new trial on the issue of damages were subsequently denied, and judgment entered in favor of the defendants on all claims. Although the plaintiffs timely filed notices of appeal, the record was not fully assembled until five years after judgment.[9]

The plaintiffs raise a multitude of issues on appeal, including the propriety of the judge's decision to dismiss their deceit claims; to grant Volkswagen's motions for judgment notwithstanding the verdict; and to conditionally grant Volkswagen's motions for a new trial. They also challenge the instructions on causation and the admission of several kinds of visual evidence, as well as the admission of evidence regarding Joyce's preaccident history of substance abuse. Finally, they argue that the judge's ruling in favor of the defendants on the c. 93A claims

---

[7]Both Joyce and George filed claims under c. 93A against Volkswagen of America, Inc., Volkswagen Aktiengesellschaft, and Lipman Motors, Inc. The parties reserved these claims for disposition after the jury verdict, and the judge did not submit them for an advisory verdict.

[8]Rule 50(c) provides, in part:

"Conditional Rulings on Grant of Motion.

(1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment."

[9]It is not clear why the record was not assembled earlier.

and the posttrial order requiring them to return to the defendants $5,900 previously placed in escrow should be vacated. We affirm.

*Facts.* On June 10, 1984, at approximately 9:00 P.M., Joyce was driving a 1971 Karmann Ghia[10] in West Springfield. Her husband, George Jr., and the couple's six month old child, George, were passengers. Although the vehicle was equipped with seat belts, neither adult wore one. George, however, was strapped into a car seat in the rear of the vehicle. Shortly before the vehicle entered the intersection of Route 20 and Sibley Avenue, George Jr. removed the baby from his car seat and brought him into the front, where he was held "chest to chest." As the Karmann Ghia crossed the west-bound lane of Route 20 before turning into the east-bound lane, it was struck on the driver's side by a 1974 Oldsmobile Cutlass.

As a result of the collision, George sustained a distraction flexion injury to his spinal cord which rendered him a paraplegic. Joyce also sustained severe bodily injuries, including a fractured pelvis and severe head injuries resulting in permanent brain damage.

1. *Motion for judgment notwithstanding the verdict.* The plaintiffs maintain that the judge erred in granting the defendants' motion for judgment notwithstanding the verdict with respect to George's claims. In reviewing the judge's decision, the standard is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s].' *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978)." *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982), quoting from *Abraham* v. *Woburn*, 383 Mass. 724, 727-728 (1981). This determination must be made "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence." *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979), quoting from *Simblest* v. *Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). Rather, judgment notwithstanding the verdict should be granted only when "there can be but one conclusion as to the verdict that reasonable men could have reached." *Ibid.* We agree with

---

[10]The Karmann Ghia, which is essentially a modified Volkswagen Beetle, was an economy-sized sports car designed and manufactured by Volkswagen Aktiengesellschaft and sold to authorized dealers by Volkswagen of America, Inc.

the judge's conclusion that in this case, because "there was a glaring and fatal deficiency on the issue of causation [regarding] George's injuries, . . . the only verdict which could reasonably have been reached [was] a defendants' verdict." Accordingly, the motion was properly granted.

Because this was a "crashworthiness" case, "the plaintiffs needed to prove (1) that crashes such as the one [in which the Karmann Ghia was involved] were reasonably foreseeable to the manufacturer; (2) that the design of the [vehicle's glove box] made it unreasonably dangerous for use in the circumstances of such a crash; and (3) that because of the design, [George] was injured more seriously than he would have been had the car been reasonably designed." *Caron* v. *General Motors Corp.*, 37 Mass. App. Ct. 744, 753 (1994). See part 2, *infra*. The plaintiffs, however, failed to present evidence at trial sufficient to persuade a reasonable jury that George's paraplegia was caused by striking his back on the open glove box door. Indeed, all the medical testimony, including that of the plaintiffs' own expert, tended to refute the plaintiffs' theory of causation.[11]

Although called by the plaintiffs as their sole medical expert on George's claim, Dr. Peter Goldman, the neurosurgeon who operated on George immediately after the accident, was never directly asked by plaintiffs' counsel whether George's injuries were consistent with impact with a glove box door, or with an impact of any kind. Indeed, Dr. Goldman's testimony was completely at odds with the plaintiffs' theory of the case and actually supported the defendants' position. Dr. Goldman explained that George sustained a distraction flexion injury, generally caused by extreme stretching and bending as a result of rapid deceleration. He stated that "[d]istraction flexion injury of the lumbar spine is a fracture that [is] ordinarily see[n] in people who have a rapid deceleration, such as a race car hitting a wall, the driver wearing only a lap belt so that the pelvis is anchored to the seat, but the upper trunk is thrown forward and

[11]In addition to the testimony specifically mentioned in this part, the defendants' theory of the case was supported by extensive photographic evidence, physical evidence, and expert testimony, some of which is discussed in part 3, *infra*, which tended to show that in an accident involving a side impact such as the one that occurred here, the occupants of the Karmann Ghia would likely have moved to the left and slightly forward as the vehicle was "swept from beneath them," rather than forward, toward the glove box. We need not discuss this testimony in any detail here, however, in light of our conclusion regarding the insufficiency of the plaintiffs' medical evidence.

flexed." He likened the effect of such an injury on the structures within the spinal canal to taking "a salami or sausage and . . . ben[ding] it forward and pull[ing] it apart." Moreover, on cross-examination, Dr. Goldman agreed that "there was nothing medically in the baby's condition . . . which indicated . . . that this spinal injury was caused by impact with a hard, narrow, rigid object such as the glove box door." Indeed, he testified that there were "things which were inconsistent with this being an injury caused by forceful impact on the spine, [including the absence of bruises or soft tissue injuries to George's back and fractures of the spinous process, the outer vertebral body closest to the back]."

The testimony of the defendants' medical expert further impugned the plaintiffs' theory of causation, and was, to a great extent, uncontradicted. Dr. Robert Mendelsohn, a neurosurgeon with over thirty-five years of experience, testified that not only were George's injuries the result of distraction and flexion, along with rotation, but that they were not caused by striking the glove box door. Dr. Mendelsohn stated unequivocally that "no narrow object hit [George's] body," and that if any such object had come in contact with George's back, he would have experienced extension, or bending backward, the very opposite of the flexion injury he sustained. Indeed, Dr. Mendelsohn opined that such an impact would not only have produced noticeable lacerations on George's back, but would have "cut him in half."

In support of their claim that judgment notwithstanding the verdict was improper, the plaintiffs emphasize an isolated portion of Dr. Goldman's direct testimony. After being asked whether, assuming "the father, with the baby in his arms, chest to chest, went forward so the baby's back impacted [sic] the open edge of the glove compartment door, . . . the fracture of the vertebrae and the spinal injury was probably caused by contact with the open glove compartment door," Dr. Goldman responded, "As you present the hypothetical situation, there is no other logical conclusion to be reached." The plaintiffs argue that this statement was sufficient to overcome their burden of producing evidence on the issue of causation. We disagree.

In light of Dr. Goldman's extensive and detailed testimony regarding the nature and likely cause of George's injuries, this

single, reluctant[12] acknowledgement cannot be construed as his expert opinion, to a reasonable degree of medical certainty, that George's injury was caused by an impact with a narrow, rigid edge such as the glove box door. Cf. *Oberlander's Case*, 348 Mass. 1, 7 (1964) (expert opinion as to causal relationship, "although clothed in the garb of probability, [was in reality] no more than [a] possibilit[y]"); *King's Case*, 352 Mass. 488, 490 (1967) (expert's opinion that blow sustained by employee in previously cancerous area hastened his death, unsupported by objective medical evidence, was really "no more than a mathematical likelihood" of causation and, therefore, should have been disregarded). Rather, we think Dr. Goldman's "so called opinion . . . [was] revealed by the cross-examination to [be] no real opinion at all." *Brownhill* v. *Kivlin*, 317 Mass. 168, 170 (1944). We agree with the trial judge that a fair interpretation of Dr. Goldman's testimony was that "his opinion, to a reasonable degree of medical certainty, was that George's injuries were absolutely *not* caused by [an impact with] the open glove box door" (emphasis supplied). Having been presented with virtually uncontroverted evidence regarding the likely cause of George's injuries, the jury were not entitled to "so wrest [Dr. Goldman's] testimony from its context as to distort its [very] meaning." *Mosher* v. *Cape Ann Sav. Bank*, 309 Mass. 512, 515 (1941).

The plaintiffs also argue that, even in the absence of expert medical testimony, the jury could infer that George's injuries occurred as a result of striking the glove box door from the testimony of their expert, John Noettl, who opined that the force of the accident would have caused George to move forward toward the glove box, and from George Jr.'s testimony that he actually saw the baby's back strike the door during the accident.[13]

While it is true that generally a plaintiff may rely on inferences to defeat a motion for judgment notwithstanding the verdict, those inferences cannot be based on mere speculation. *Poirier* v. *Plymouth*, 374 Mass. at 212. Moreover, our appellate courts and those in other jurisdictions have recognized the

---

[12]Indeed, during a bench conference, the plaintiffs' counsel attempted to have Dr. Goldman, his own witness, declared "hostile."

[13]Although we regard the testimony of George Jr. on this point as suspect, we accept it as true for purposes of determining the propriety of the judge's decision to grant judgment notwithstanding the verdict.

necessity for expert medical testimony on highly technical medical issues, such as injury causation and enhancement of injury to the spine resulting in paraplegia. See *Look's Case*, 345 Mass. 112, 115 (1962) ("the causal relationship between the . . . injury and the alleged incapacity is [generally] a matter beyond the common knowledge and ability of the layman and must[, therefore,] be established by expert medical testimony"); *Casey's Case*, 348 Mass. 572, 574 (1965) (expert testimony required in disability case involving aggravation of disc injury); *Held* v. *Bail*, 28 Mass. App. Ct. 919, 921 (1989) (when "the causation question involves questions of medical science or technology, the jury requires the assistance of expert testimony"). See also *Curtis* v. *General Motors Corp.*, 649 F.2d 808, 813 (10th Cir. 1981) ("expert testimony is required" regarding cause of plaintiff's back injury in crashworthiness case); *Duran* v. *General Motors Corp.*, 101 N.M. 742, 753 (Ct. App. 1983) (on the question of whether additional intrusion caused spinal injury, "expert proof is essential"). In this case, we do not think the question of precisely what caused George's spinal injury and his resultant paraplegia was "sufficiently obvious as to lie within [the] common knowledge" of the jury. *Haggerty* v. *McCarthy*, 344 Mass. 136, 139 (1962). Accordingly, we conclude that in the absence of expert medical testimony on the issue, the jury could have had no basis other than conjecture, surmise or speculation upon which to conclude that the injury was caused by an impact with the open glove box door. See *Soileau* v. *Ford Motor Co.*, 639 F.2d 214, 216 (5th Cir. 1981) (plaintiff's testimony that he suffered a hyperflexion injury insufficient to avoid judgment notwithstanding the verdict in favor of defendant where medical experts for both sides stated that plaintiff's spinal injury was the result of hyperextension rather than hyperflexion); *Curtis* v. *General Motors Corp.*, 649 F.2d at 812-813 (jury could not infer, based on plaintiff's testimony that he was positioned partially under an overturned vehicle after an accident, that his back injury was caused by the crushing force of the vehicle, where there were no bruises or other evidence of trauma on his back and no medical testimony to support his claim). See also *Kaye* v. *Newhall*, 356 Mass. 300, 303 (1969) (prejudicial error to submit case to jury where plaintiff's testimony that he became impotent as a result of defendant's conduct was not supported by expert testimony of either impotence or causation). We hold, therefore, that the allowance

of the motion for judgment notwithstanding the verdict was warranted.[14, 15]

2. *Jury instructions.* The plaintiffs next challenge the causation instruction. Initially, the judge indicated that he would give an instruction which comported with the rationale articulated in the line of cases known as *Fox-Mitchell.* See *Fox* v. *Ford Motor Co.,* 575 F.2d 774 (10th Cir. 1978); *Mitchell* v. *Volkswagenwerk AG,* 669 F.2d 1199 (8th Cir. 1982). The *Fox-Mitchell* approach has been adopted by the majority of jurisdictions that have

[14]The plaintiffs also contend that the judge erred in conditionally granting the defendants' motion for a new trial. Again, we disagree. "The standard that a trial judge is to apply on a motion for a new trial in a civil case is whether the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons . . . failed to come to a reasonable conclusion." *W. Oliver Tripp Co.* v. *American Hoechst Corp.,* 34 Mass. App. Ct. 744, 748 (1993). The decision whether to grant "a new trial on the ground that the verdict is against the weight of the evidence rests in the discretion of the judge." *Adams* v. *United States Steel Corp.,* 24 Mass. App. Ct. 102, 103 (1987). Thus, the allowance of a motion for a new trial will not be reversed absent a clear abuse of that discretion. *W. Oliver Tripp Co.* v. *American Hoechst Corp., supra* at 747, citing *Davis* v. *Boston Elev. Ry. Co.,* 235 Mass. 482, 496 (1920). Cases involving seriously injured children present perhaps the greatest risk that jurors will improperly be influenced by emotion and sympathy. See *Richardson* v. *Richardson-Merrell, Inc.,* 857 F.2d 823, 832 (D.C. Cir. 1988). While "[i]t would be foolhardy to expect members of the jury to be without compassion for the catastrophe that befell this family[,] . . . in a case such as this, it is not only appropriate but indeed imperative that the court remain vigilant to ensure that neither emotion nor confusion has supplanted reason." *Ibid.* Having determined that the judge properly granted the defendants' motion for judgment notwithstanding the verdict in this case, there can be no doubt that he acted within his discretion in ordering a new trial.

The plaintiffs also maintain that, because the judge based his order conditionally granting the defendants' motion for a new trial on insufficient evidence of causation, the jury's verdicts on negligence and breach of warranty should be reinstated. This claim is completely without merit, as both causes of action include causation as an essential element.

[15]Another claim of error raised by the plaintiffs on appeal is their contention that because the damages awarded to George and his parents were "greatly disproportionate to the injur[ies] proved," see *Mirageas* v. *Massachusetts Bay Transp. Authy.,* 391 Mass. 815, 822 (1984), the judge erroneously denied their new trial motions on the issue of damages. They further claim that the inadequate verdict resulted from an erroneous instruction regarding the proper measure of damages. However, in light of our decision to affirm the judge's order granting judgment notwithstanding the verdict in favor of the defendants, we need not address the proper measure of damages.

considered the specificity with which a plaintiff who has sustained indivisible injuries[16] in a crashworthiness case must establish causation.[17] Although counsel for the plaintiffs agreed with the judge's determination that the *Fox-Mitchell* rationale was applicable, he objected to the exact language of the proposed instruction. The judge subsequently instructed the jury as follows:

> "[Y]ou must decide whether the acts or omissions of the defendant constituted a substantial contributing factor in causing the plaintiffs' injuries. It does not matter whether other concurrent causes contributed to the injuries, so long as you find that the defendants' actions or omissions were a substantial contributing factor in producing them. . . . The plaintiff must prove that after the original impact . . . the defect or defects in this automobile legally caused or enhanced the injuries which resulted. . . . [I]f the plaintiff has proved to you by a fair preponderance of the evidence that the defective or negligently designed automobile was a substantial contributing factor in producing damages *over and above* those which probably would have been caused as a result of the original impact absent a defective design, then the plaintiff has satisfied his or her burden of proof on the element of causation." (Emphasis supplied.)

The judge further noted that the defendants' acts or omissions "need not be the sole cause of the plaintiffs' injuries in order to establish the defendants' responsibility to the plaintiffs."

On appeal, the plaintiffs contend that the judge erred in

[16]An indivisible injury is said to have been sustained when the task of allocating causal responsibility between the initial impact of the accident and the alleged defect is not possible. Here, there is no dispute that the injuries sustained by George and Joyce were indivisible.

[17]The plaintiffs had urged the court to instruct in accordance with the *Fox-Mitchell* approach, which has been adopted by twenty-three States as well as Restatement (Third) of Torts: Products Liability § 16, at 235-236 (1998). *Fox-Mitchell* relieves a plaintiff in cases involving indivisible injuries of the burden of proving that his injuries are apportionable. See *Jackson* v. *Warrum*, 535 N.E.2d 1207, 1220 (Ind. Ct. App. 1989). The defendants argued that the instruction should reflect the minority view, known as the *Huddell* approach, which places an increased burden on the plaintiff in such cases. See *Huddell* v. *Levin*, 537 F.2d 726, 738-739 (3d Cir. 1976). See Restatement (Third) of Torts: Products Liability § 16 comment d, illustration 6, at 240 (plaintiff must be able to "quantify . . . increased harm" in order to recover under *Huddell*).

including the "over and above" language quoted above. They maintain that since both Joyce and George suffered indivisible injuries, they were required to show only that the alleged defects in the Karmann Ghia contributed to their injuries — a burden which could be satisfied even if they would have sustained the identical injuries in the absence of any defect. The defendants argue that the judge erred in instructing in accordance with *Fox-Mitchell* rather than with the rule articulated in *Huddell* v. *Levin*, 537 F.2d 726, 737-738 (3d Cir. 1976). In the alternative, they maintain that the instruction given by the judge fully comports with *Fox-Mitchell* and their progeny. We hold that the judge properly chose to instruct the jury in accordance with *Fox-Mitchell*, and that the challenged instruction was adequate.

The plaintiffs misapprehend the distinction between the *Fox-Mitchell* and *Huddell* approaches to establishing liability. The touchstone of liability in all crashworthiness cases is the existence of some enhanced injury, i.e., an injury "over and above" that which would have been sustained in the absence of the alleged defect. See *Smith* v. *Ariens Co.*, 375 Mass. 620, 623-624 (1978) ("enhanced injuries from collisions are foreseeable as incidental to the normal use of certain products and [the line of cases represented by *Larsen* v. *General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968)] imposes liability on manufacturers for these injuries"); *Simmons* v. *Monarch Mach. Tool Co.*, 413 Mass. 205, 212 (1992) (applying crashworthiness doctrine to claim arising as a result of an industrial accident, and noting that liability will attach "where the design defect enhances the [plaintiff's] injuries"); *Caron* v. *General Motors Corp.*, 37 Mass. App. Ct. at 753 (in crashworthiness case, plaintiff must establish that "because of the [allegedly defective] design he was injured more seriously than he would have been had the car been reasonably designed"); Restatement (Third) of Torts: Products Liability § 16 comment a, at 236 (in crashworthiness case "[the plaintiff] would have suffered some injury as a result of the accident even in the absence of the claimed . . . defect . . . [and the] seller [or manufacturer] is responsible only for the increased harm"). Notwithstanding their argument to the contrary, the plaintiffs fail to cite a single case which stands for the proposition that a plaintiff seeking to recover for indivisible injuries in a crashworthiness case is relieved of the burden of demonstrating that a safer design would have resulted in less severe injuries. Indeed, the distinction between *Huddell* and

*Fox-Mitchell* becomes relevant only after *some* enhanced injury
has been established. See *Huddell* v. *Levin*, 537 F.2d at 738
("one thing, at least, is clear: the automobile manufacturer is li-
able only for the enhanced injuries attributable to the defective
product").

Under *Huddell*, a plaintiff seeking to establish liability for
indivisible injuries in a crashworthiness case must demonstrate
not only that the alleged product defect was a substantial factor
in producing enhanced injuries, he must also prove the extent of
the enhanced injuries that are attributable to the defective
design. *Huddell*, *supra* at 737-738. Thus, in jurisdictions that
have adopted the *Huddell* approach, "even if the plaintiff can
establish that some increased harm was caused by the defendant,
[he] is unable to recover [unless he is also able to quantify the
increased harm.]" Restatement (Third) of Torts: Products Li-
ability § 16, Reporters' note to comment d, at 244.

Even under the more lenient *Fox-Mitchell* approach, however,
"[p]roof of a defect does not, of itself, establish a case of
increased harm. The plaintiff must also establish that the defect
was a substantial factor in increasing [his] harm beyond the
harm that would have occurred [in the absence of any defect.
Under *Fox-Mitchell*, when the proof adduced at trial] does not
support [the apportionment of liability], the product seller is li-
able for all harm suffered by the victim. However, [this] rule
does not take effect until the plaintiff establishes . . . by
competent testimony, that [his] harm was increased as a result
of the product defect." Restatement (Third) of Torts: Products
Liability § 16 comment b, at 238. Accordingly, although ap-
plication of the *Fox-Mitchell* approach relieves a plaintiff of the
burden of proving "that the damages that arose from the
enhanced injury are apportionable," he must nevertheless
establish that the defect upon which his claim is based "was a
substantial factor in producing damages over and above those
which were probably caused as a result of the original impact or
collision." *Jackson* v. *Warrum*, 535 N.E.2d 1207, 1220 (Ind. Ct.
App. 1989). See *Czarnecki* v. *Volkswagen of America*, 172 Ariz.
408, 413 (Ct. App. 1991) ("in a crashworthiness case with an
indivisible injury, the plaintiff fulfills his burden of proof by
showing that the defective design caused him to sustain injuries
over and above those that otherwise would have occurred in the
first collision"); *Oakes* v. *General Motors Corp.*, 257 Ill. App.
3d 10, 23 (1993) (adopting the *Mitchell* approach and noting

that "[t]he plaintiff must show only that the design defect was a 'substantial factor' in producing damages over and above those which were probably caused as a result of the original impact"). See also *McLeod* v. *American Motors Corp.*, 723 F.2d 830, 834-835 (11th Cir. 1984); *McDowell* v. *Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 867 (Mo. Ct. App. 1990). But see *DePaepe* v. *General Motors Corp.*, 33 F.3d 737, 740 (7th Cir. 1994) (stating that *Oakes* is governing law of Illinois, but concluding that "the concept of enhanced injury had no place in" the case because the plaintiff's injury was indivisible). The challenged instruction, therefore, represents an accurate statement of the rule articulated in *Fox-Mitchell* and its progeny.

3. *Evidentiary issues.* The plaintiffs next contend that the judge erroneously admitted several types of visual evidence at trial, including a computer-generated animation and two videotapes prepared by the defendants' experts. They also claim that evidence of Joyce's preaccident history of substance abuse and methadone therapy unfairly prejudiced the jury.[18]

a. *Visual evidence.* We first consider the visual evidence. The plaintiffs allege error in the admission of a computer-generated animation and two videotapes prepared by defense experts. They first argue that the admission of the evidence was error due to the defendants' failure to comply with a discovery order regarding the pretrial production of tests or literature upon which their experts relied.

"The conduct and scope of discovery is within the sound discretion of the trial judge . . . [and we decline to] interfere with the judge's exercise of discretion [where, as here, we discern no] abuse of [that] discretion." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987) (citations omitted). As the defendants correctly point out, the trial judge in this case was confronted with two, somewhat inconsistent, pretrial orders regarding the defendants' obligation to produce certain test results or literature upon which their experts relied.[19] With respect to one of the challenged videotapes, which depicted a

---

[18]Plaintiffs also claim that certain photographs were erroneously admitted. However, they have not offered any reasoned argument as to why the photographs were "unduly prejudicial."

[19]It appears that on March 20, 1990, a Superior Court judge denied the plaintiffs' motion requesting test results of exemplar vehicles, and that two days later, another judge granted a similar motion requesting "the literature and test results on which the . . . defendants' experts relied."

sled test involving an exemplar Karmann Ghia, the judge correctly ruled that the earlier of the two orders expressly denied the plaintiffs' request for "tests on exemplar vehicles." As for the second videotape and the computer animation offered by the defendants in conjunction with the testimony of their expert, Raymond McHenry, we agree with the trial judge that these were not tests relied upon by the defense at all, but rather, illustrations intended to assist the jury in understanding McHenry's complex testimony. Accordingly, they did not come within the terms of the second order. Finally, the plaintiffs could not have been prejudiced by any late disclosure of the tapes at issue, because the actual results of McHenry's computer analyses and a list of literature relating to the programs he used were provided by the defendants prior to trial, and the videotape of the sled test was made available approximately two weeks before it was shown to the jury.

We also reject the plaintiffs' substantive arguments regarding the admissibility of the challenged evidence. The first videotape introduced through McHenry, an engineer who performed a complete accident reconstruction for the defense, demonstrated the use of computers to predict and reconstruct accidents, and included a brief movie excerpt of a complex automobile stunt accomplished with the assistance of computers. Contrary to the plaintiffs' assertion that the tape was prejudicial to their case because it somehow suggested that "Hollywood is in use to fix the gouge mark and the point of impact," we agree with the judge's conclusion that the film likely "assist[ed] the jury in understanding the very technical nature of [McHenry's] testimony." Moreover, any risk of prejudice to the plaintiffs was eliminated when, prior to seeing the tape, the jury were instructed that it "ha[d] nothing to do with . . . the facts of th[e] case, but . . . [might] assist [them] in understanding the techniques that the witness ha[d] been talking about."

The plaintiffs' challenge to the admission of a brief animation, also used by McHenry to depict the result of a computer simulation of the movement of the vehicles and their occupants in the accident, is equally unavailing. The plaintiffs characterize the animation as a "computer simulation," and argue that it did not meet the foundational requirements for admissibility established for such evidence in *Commercial Union Ins. Co.* v.

*Boston Edison Co.*, 412 Mass. 545, 549-550 (1992).[20] The defendants maintain that the animation was not itself a simulation, but rather, a visual representation of McHenry's testimony concerning the results of one computer simulation program, known as SMAC, which he utilized to verify his opinions in this case. Whatever the proper characterization of the challenged animation, any error in its admission would have been harmless. The animation was admitted in evidence only after McHenry had already testified, without objection, regarding the results of the SMAC simulation and his resultant opinions. Moreover, a number of additional charts depicting McHenry's reconstruction and analysis of the movement of the occupants inside the Karmann Ghia were also admitted through his testimony. Thus, the animation was merely cumulative of other evidence in the case and could not, therefore, have prejudiced the plaintiffs. See *Doyle* v. *Dong*, 412 Mass. 682, 689 (1992).

The final piece of visual evidence challenged by the plaintiffs is a videotaped sled test which was admitted during the testimony of defense expert, Wolfhard Albers, the safety test engineer for Volkswagen who conducted the challenged test at Volkswagen's testing facility in Germany. During the test, a modified exemplar of the Karmann Ghia containing anthropomorphic dummies was mounted on a sled which was then suddenly accelerated and decelerated to simulate certain accident conditions, including the speed and direction of the occupants' movement within the vehicle. The plaintiffs claim that the test was not sufficiently similar to the actual accident conditions so as to be relevant, and that its admission likely confused the jury.

In determining whether a test such as the one at issue is admissible, a trial court must consider "whether the evidence is relevant, the extent to which the test conditions are similar to the circumstances surrounding the accident, and whether the [experiment, demonstration or reenactment] will confuse or mislead the jury." *Calvanese* v. *W.W. Babcock Co.*, 10 Mass. App. Ct. 726, 730 (1980). The decision whether to admit such evidence "must be largely left to the discretion of the trial

---

[20]In *Commercial Union*, the court stated that "we treat computer-generated models or simulations like other scientific tests, and condition admissibility on a sufficient showing that (1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and (3) the program is generally accepted by the appropriate community of scientists. See *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963)." 412 Mass. at 549.

judge, and that discretion will not be interfered with [on appeal] unless in its exercise [the judge] clearly appears to be wrong." *Ibid.*, quoting from *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 365 (1980). Such is not the case here.

The sled test was offered by the defense to demonstrate two things: the real time movement of the occupants in the crash, and the components with which they would likely have come into contact if the vehicle moved at a fifty-three degree angle, as calculated by McHenry. The resulting damage to the exemplar vehicle's interior, such as deformation of the steering wheel and gear shift, could then be compared to the damage actually seen in the plaintiffs' Karmann Ghia. In these circumstances, "[t]he relevancy of the [test] to [the] defendant[s'] theory of causation can [hardly] be disputed." *Szeliga* v. *General Motors Corp.*, 728 F.2d 566, 567 (1st Cir. 1984). Indeed, the test illustrated the movement of the occupants of the Karmann Ghia in a manner consistent with the opinions offered by a key defense expert, and the damage sustained by the exemplar vehicle was similar to that seen in the plaintiffs' vehicle.

While the test did not replicate the conditions of the accident exactly, it was similar enough to allow the jury to infer "something material," i.e., how the occupants would have moved inside the vehicle and what parts of the interior they would likely have struck if they moved in the direction posited by the defendants' experts.[21] Nothing more was required. See *Read* v. *Mt. Tom Ski Area, Inc.*, 37 Mass. App. Ct. 901, 904 (1994) (test is whether jury could infer something material from proffered test). See also *Calvanese*, 10 Mass. App. Ct. at 731 (determination of whether tests are "sufficiently similar" to actual incident is within judge's discretion).

Finally, where, as here, the differences between the sled test and the actual accident, including the use of an obviously altered exemplar vehicle at a testing facility bearing no resemblance to an actual roadway, the absence of the hood of another car intruding into the driver's side of the exemplar vehicle, and the use of anthropomorphic dummies rather than human beings, are obvious, there is little danger that the jury could have been misled or confused. Contrast *Swajian* v. *General Motors Corp.*, 916 F.2d 31, 36 (1st Cir. 1990); *Fusco* v. *General Motors Corp*, 11

---

[21]Indeed, the judge ruled that a second test on the same tape, which purported to show occupant movement during a head-on collision, was not sufficiently similar to the actual accident to be admissible.

F.3d 259, 263-264 (1st Cir. 1993) (both cited by the defendant and involving human drivers on actual roadways).

b. *Evidence of preaccident substance abuse.* We turn next to the plaintiffs' contention that the admission of evidence regarding Joyce's history of drug and alcohol abuse was irrelevant and unduly prejudicial. Following the accident in June, 1984, Joyce was hospitalized, and her condition gradually improved. She was discharged from the hospital in August, and at that time, was able to "manage for herself at home" with the assistance of family members. On the evening of October 28, 1984, however, Joyce consumed a significant amount of Darvocet, a prescription pain killer, along with six beers and a shot of whiskey. The following day she was again hospitalized, and, upon being discharged some five months later, her condition had significantly and permanently deteriorated.

The plaintiffs offered medical records and bills relating to both the first and second hospitalization, along with testimony from Joyce's physicians, in an attempt causally to relate the overdose and subsequent deterioration in her condition to her original injuries. To counter this evidence, and to rebut any inference that Joyce's excessive use of prescription narcotics and alcohol was caused by the accident, the defendants elicited testimony during their cross-examinations of George Jr. and Dr. Randolph Knob, one of Joyce's treating physicians, concerning Joyce's history of substance abuse. In addition, medical records containing references to Joyce's prior alcohol and heroin abuse, and her ongoing preaccident methadone treatment, were admitted.[22] After the evidence came in, the judge gave a forceful limiting instruction, in which he told the jury that it was being offered for the limited purpose of determining "whether or not [Joyce's] second hospitalization . . . was proximately caused by any acts or omissions on the part of the defendants." He further cautioned that the evidence must not be considered "as evidence of bad character . . . [or of] how the accident happened, [or] to prove in any way [that] there was a defect or there was not a defect in the Volkswagen . . . ." The plaintiffs maintain all references to Joyce's preaccident substance abuse should have been excluded.

The decision whether evidence is relevant and, if so, whether

---

[22]The judge agreed to prohibit all references to Joyce's use of drugs or alcohol on the day of the accident, however, after her negligence claims were voluntarily dismissed.

its probative value is outweighed by its prejudicial effect, is largely within the discretion of the trial judge. *Read* v. *Mt. Tom Ski Area, Inc.*, 37 Mass. App. Ct. at 902. See *Commonwealth* v. *Harvey*, 397 Mass. 351, 358-359 (1986). In these circumstances, we discern no abuse of that discretion. Rather, we think the challenged evidence was relevant to the issue of whether Joyce's second hospitalization and the resultant deterioration in her condition were caused by the conduct of the defendants. Moreover, "[t]he limiting instructions given by the judge were sufficient to clarify the purpose for which the evidence could properly be used." *Commonwealth* v. *Harvey, supra* at 359. See also *Commonwealth* v. *Tuitt*, 393 Mass. 801, 809 (1985) (jury is presumed to have followed proper limiting instruction).

4. *Dismissal of plaintiffs' deceit claims.* The plaintiffs also maintain that the judge's dismissal of the deceit counts against all three defendants at the close of the plaintiffs' evidence was error. They argue that the evidence adduced at trial was sufficient to establish the defendants' implicit representation that the Karmann Ghia was safe, as well as the plaintiffs' reliance upon that representation, and their resultant injury.[23] The absolute failure of the plaintiffs in this case to establish a causal relationship between the acts or omissions of the defendants and their injuries, however, renders their claim untenable.[24] See *DuBois* v. *Atlantic Corp.*, 322 Mass. 512, 520-521 (1948) (plaintiff required to show some damage resulted from defendant's misrepresentations).

5. *Plaintiffs' c. 93A claims.* The plaintiffs next argue that the judge's ruling in favor of the defendants on the c. 93A claims should be vacated. The judge issued detailed findings of fact and rulings of law in support of his decision. Specifically, he found that neither the glove box door nor the A-pillar were defective and that both were designed and manufactured in accordance with good engineering practices. He further found that

[23] "In a deceit action, the plaintiff must prove 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.' " *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982) (citations omitted). See Restatement (Second) of Torts § 525 (1977).

[24] Our review of the transcript leads us to conclude not only that the judge properly granted judgment notwithstanding the verdict on George's claims, but also that the jury were correct in finding that any defect in the Karmann Ghia was not a substantial contributing factor in Joyce's injuries.

Joyce's head did not strike the allegedly defective A-pillar, and that George and George Jr. moved violently to the left during the accident rather than forward, and, accordingly, that they moved in the direction of the gearshift and the steering wheel rather than toward the glove box. Thus, he concluded that George's back never struck the glove box door. Finally, the judge found that "no defendant was negligent [or] breached its implied warranty of merchantability[, and that] no defendant knowingly or willingly violated G. L. c. 93A."

The judge's findings of fact, including his "determination that [the defendants] did not engage in any unfair or deceptive act or practice [are questions] of fact and therefore must stand unless clearly erroneous." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 476 (1991). The record in this case contains ample support for the judge's conclusion that neither the glove box door nor the A-pillar was defective and that both were designed and manufactured in accordance with good engineering practices. The findings that Joyce's head did not strike the A-pillar, and that George's back never struck the glove box door, are similarly supported. Indeed, the plaintiffs do not claim that these findings are clearly erroneous. Rather, they rely on an allegedly inadequate jury instruction to support their claim, and maintain that, in ruling on the c. 93A claim, the judge failed to consider that in a breach of warranty case such as this, state of the art is irrelevant in determining liability. See *Hayes* v. *Ariens Co.*, 391 Mass. 407, 413 (1984).[25] Accordingly, they seem to suggest that the judge erroneously concluded that, because the vehicle was designed and manufactured in accordance with good engineering practice, it could not have been defective.[26] Again, we discern no error.

Although the judge declined to give the precise instruction requested by the plaintiffs, the instruction heard by the jury and, accordingly, upon which the judge relied in reaching his own decision, adequately described the elements necessary to sustain

---

[25]The law regarding state of the art in the context of implied warranty of merchantability cases, as stated in *Hayes* v. *Ariens Co.*, 391 Mass. at 413, was recently changed by *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. 1, 19-23 (1998).

[26]The plaintiffs claim not only that the judge relied on his own erroneous instruction on state of the art in reaching his decision on the c. 93A claim, but also that the faulty instruction affected the jury's verdict against Joyce. They further contend that the instruction on causation, which we deemed adequate in part 2, *supra*, adversely influenced the judge's decision.

the plaintiffs' breach of warranty claims. See *Commonwealth* v. *Roberts*, 378 Mass. 116, 130 (1979) (as long as instructions are "adequate and clear . . . on the applicable law, the phraseology, method and extent of the charge are matters within [the judge's] discretion"). First, the judge thoroughly discussed with the jury the concept of liability based on breach of warranty, and outlined the essential elements of such a claim: (1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the plaintiff was using the product in a manner that the defendant intended or that could reasonably have been foreseen; and (4) that the defect or unreasonably defective condition was a legal cause of the plaintiff's injury. See G. L. c. 106, § 2-314; Restatement (Second) of Torts § 402A (1965). See also *Back* v. *Wickes Corp.*, 375 Mass. 633, 640 (1978) ("Legislature has made the Massachusetts law of warranty congruent in nearly all respects with the principles expressed in . . . § 402A").

Moreover, the judge also told the jury that, "[i]n determining whether or not a breach of warranty occurred, [their] focus [should be] on the product characteristics . . . not on the conduct of the user, manufacturer or seller of the product, [and that t]he defendant may be found to have breached its warranty even though it exercised all possible care in the preparation and sale of the product." Finally, the judge cautioned the jury that "conformity to standard [business custom or] practice . . . is not dispositive and . . . controlling of the question of whether the defendant breached its implied warranty of merchantability." This instruction was sufficient. Cf. *Back* v. *Wickes Corp.*, 375 Mass. at 642-643 (judge correctly refused to instruct jury that evidence of manufacturer's conformity with industry practice was immaterial to their decision, as "[e]vidence [of such conformity is] clearly relevant to issue [of whether manufacturer breached warranty of merchantability]").

6. *Return to defendant of escrow.* Prior to trial, the defendants filed a motion to preclude the plaintiffs from offering the testimony of one of their designated experts, Paul O'Shea, unless a fee of $5,900, previously advanced by the defendants for O'Shea's anticipated expenses associated with his deposition,

was refunded.[27] In support of their motion, the defendants alleged, among other things, that counsel for the plaintiffs had demanded prepayment of O'Shea's fee and estimated expenses as a prerequisite to allowing the defendants to take his deposition; that a check in the amount of $5,900 had been mailed by the defendants to counsel for the plaintiffs; that the deposition was subsequently cancelled and rescheduled several times by the plaintiffs, and once by the defendants; that counsel for the plaintiffs had attempted to use the $5,900 as a retainer for O'Shea's services rather than as an advance toward future expenses, and that once O'Shea had been informed that the funds were intended to be an advance, he had agreed to return the full amount to the defendants.

A Superior Court judge allowed the motion, "unless the plaintiffs deposit[ed]" into court $5,900, representing the sum that "clearly was forwarded by the defendants and was to be used for [O'Shea's] expenses." In making his ruling, the motion judge indicated that the final determination regarding the proper disposition of the funds would be made at a later date. Indeed, a posttrial evidentiary hearing was held, after which the trial judge ordered it returned to Volkswagen. In his memorandum and order, the trial judge found (1) that the $5,900 was advanced to defray fees and expenses connected with O'Shea's planned deposition; (2) that O'Shea did not incur any "expenses [or] suffer any financial loss;" and (3) that the plaintiffs had attempted to use the $5,900 to pay O'Shea's "retainer for services to be rendered to the[m]."

The plaintiffs' arguments in this respect are reprehensible. They maintain first, that the motion judge should never have ordered the funds to be placed into escrow and, second, that the trial judge erred in ordering that the funds be turned over to the defendants. The plaintiffs fail to support their first contention with relevant authority or reasoned argument as contemplated by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Accordingly, we do not consider it. See *Bjorkman* v. *Suffolk Constr. Co.*, 42 Mass. App. Ct. 591, 595 (1997).[28] We review the trial judge's decision to turn over the $5,900 to the

[27] O'Shea lived in California and would have had to travel to Boston in order to view the Karmann Ghia and be deposed by the defendants.

[28] We have similarly not considered the plaintiffs' unsupported assertion that "[t]he court erred by not taking the action required by [G. L. c.] 261, § 27D," as it too, is unsupported by relevant facts or authority.

defendants for an abuse of discretion. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. at 799 ("conduct and scope of discovery is within the sound discretion of the judge"). The trial judge's findings regarding the disputed funds are amply supported in the record. There is no evidence that O'Shea ever traveled to Boston or otherwise incurred expenses or financial loss associated with his planned deposition. Moreover, it does not appear that O'Shea's deposition was ever taken in this case. Accordingly, the trial judge's decision that the funds should be returned to Volkswagen does not represent an abuse of discretion.

For all of the reasons discussed above, the judgments in favor of the defendants, Volkswagen Aktiengesellschaft, Volkswagen of America, Inc., and Lipman Motors, Inc., are affirmed.

*So ordered.*